## HARRIS *v.* SOUTH CAROLINA.

No. 76.  Argued November 16, 1948.—Decided June 27, 1949.

*Julian B. Salley, Jr.* and *Leonard A. Williamson* argued the cause and filed a brief for petitioner.

*B. D. Carter* argued the cause for respondent. With him on the brief was *John M. Daniel,* Attorney General of South Carolina.

MR. JUSTICE FRANKFURTER announced the judgment of the Court and an opinion in which MR. JUSTICE MURPHY and MR. JUSTICE RUTLEDGE join.

On Sunday morning, April 28, 1946, Edward L. Bennett and his wife were killed in their store in Aiken

County, South Carolina. Bennett's last words were, "A big negro shot me and robbed me." Petitioner, Harris, age twenty-five, a slightly built Negro, was subsequently indicted in the Court of General Sessions for Aiken County and found guilty of the murder of the Bennetts. The jury's verdict required imposition of the death sentence. The Supreme Court of South Carolina denied the claim that a confession introduced at the trial was obtained under circumstances which precluded its admission under the Due Process Clause and sustained the conviction, 212 S. C. 124, 46 S. E. 2d 682, by a 3–2 vote, two judges dissenting on the ground that the facts show that the confession "was not freely and voluntarily made." We brought the case here to consider the validity of this claim. 334 U. S. 837.

When the disputed testimony is resolved in favor of the State, the following facts emerge:

The police of Aiken County spent two and a half months in fruitless investigation of the murders. Many suspects had been held for interrogation and then released. Suspicion was finally directed toward petitioner by reports that he possessed a pistol and had left for Nashville, Tennessee, soon after the murders. The Sheriff of Aiken County then obtained a warrant, ostensibly for the purpose of arresting petitioner for the theft of his aunt's pistol but actually to secure his return from Nashville. He was taken into custody there on Friday, July 12, 1946. No warrant was read to him and he was not informed of the charge against him. He was brought back to Aiken County and lodged in its jail on Sunday afternoon at about four o'clock. He first learned that he was suspected of the murder of Bennett on Monday afternoon. He denied the accusation. At that time he was briefly interrogated by the sheriff and the jailer.

On Monday night questioning began in earnest. At least five officers worked in relays, relieving each other

from time to time to permit respite from the stifling heat of the cubicle in which the interrogation was conducted. Throughout the evening petitioner denied that he had killed the Bennetts. On Tuesday the questioning continued under the same conditions from 1:30 in the afternoon until past one the following morning with only an hour's interval at 5:30. On Wednesday afternoon the Chief of the State Constabulary, with half a dozen of his men, questioned petitioner for about an hour, and the local authorities carried on the interrogation for three and a half hours longer. At 6:30 that evening the examination resumed. Petitioner continued to deny implication in the killings. The sheriff then threatened to arrest petitioner's mother for handling stolen property. Petitioner replied, "Don't get my mother mixed up in it and I will tell you the truth." Petitioner then stated in substance what appears in the confession introduced at the trial. The session ended at midnight.

Petitioner was not informed of his rights under South Carolina law, such as the right to secure a lawyer, the right to request a preliminary hearing, or the right to remain silent. No preliminary hearing was ever given and his confession does not even contain the usual statement that he was told that what he said might be used against him. During the whole period of interrogation he was denied the benefit of consultation with family and friends and was surrounded by as many as a dozen members of a dominant group in positions of authority. It is relevant to note that Harris was an illiterate.

The trial judge in his charge told the jury that without the confession there was no evidence which would support a conviction and instructed them that they could consider the confession only if they found it to have been "voluntary." Upon appeal, the highest court of the State made a conscientious effort to measure the circumstances under which petitioner's confession was made against the

circumstances surrounding confessions which we have held to be the product of undue pressure. It concluded that this confession was not so tainted. We are constrained to disagree. The systematic persistence of interrogation, the length of the periods of questioning, the failure to advise the petitioner of his rights, the absence of friends or disinterested persons, and the character of the defendant constitute a complex of circumstances which invokes the same considerations which compelled our decisions in *Watts* v. *Indiana, ante,* p. 49, and *Turner* v. *Pennsylvania, ante,* p. 62. The judgment is accordingly

*Reversed.*

MR. JUSTICE BLACK concurs in the judgment on the authority of *Chambers* v. *Florida,* 309 U. S. 227; *Ashcraft* v. *Tennessee,* 322 U. S. 143.

On the record before us and in view of the consideration given to the evidence by the state courts and the conclusion reached, THE CHIEF JUSTICE, MR. JUSTICE REED and MR. JUSTICE BURTON believe that the judgment should be affirmed.

[See *ante,* p. 57, for opinion of MR. JUSTICE JACKSON, concurring in the result in No. 610, *Watts* v. *Indiana, ante,* p. 49, and dissenting in this case and in No. 107, *Turner* v. *Pennsylvania, ante,* p. 62.]

MR. JUSTICE DOUGLAS, concurring.

The undisputed facts concerning the arrest and interrogation of the petitioner are as follows:

A storekeeper and his wife were killed in Aiken, South Carolina. The killing seemed similar to other crimes which had been committed in the community and which constituted a local crime wave. Local feeling was running high and the sheriff's office was anxious to find a

solution. Numerous persons were interrogated. Nearly three months later suspicion fell on petitioner, because it became known that he possessed a pistol and had left the community for Nashville, Tennessee, shortly after the murder had occurred. The sheriff secured a warrant of arrest for the petitioner, allegedly for possessing a stolen pistol. The authorities in Nashville were notified that petitioner was wanted, and he was picked up there and placed in custody on a Friday. On the next Sunday he was delivered to the South Carolina officers. He was not read the warrant of arrest, nor was he informed that he was suspected of having committed the murder with which he was later charged and now stands convicted. While handcuffed, he was driven back to Aiken and lodged in the Aiken jail late that afternoon without being brought before a magistrate. That was Sunday. It was not until Monday afternoon that he was informed that he was under suspicion of having committed the murder. He was questioned a short time. He denied his guilt. A more extended questioning was held that night. The next day, Tuesday, the vigor of the questioning was increased. Petitioner was interrogated in the afternoon and again in the evening until around midnight. It was during this session that two incidents occurred. Petitioner had denied his guilt, but finally made a statement implicating another negro, who denied guilt when confronted with the accusation. It was also on Tuesday evening that one of the officers laid a hand on the petitioner. Sharp issue is taken on the nature of this act. Petitioner contends that he was struck with force. The officer testified that he merely placed his hand on petitioner's shoulder with no malice and that he merely stated that he did not believe certain statements that the petitioner had made.

On Wednesday afternoon the questioning was begun again. Petitioner still denied guilt. Wednesday eve-

ning he finally broke. The sheriff was alone with petitioner late at night. He threatened to have petitioner's mother arrested for having stolen property. It was then that petitioner offered to make the confession that was eventually used against him. Petitioner made his confession, and he was then removed to the state penitentiary for protection.

These interrogations had been held in a small room eight feet by eleven. Small groups of different officers conducted these interrogations, which went on and on in the heat of the days and nights. But during this time he was denied counsel and access to family and friends.

This is another illustration of the use by the police of the custody of an accused to wring a confession from him. The confession so obtained from literate and illiterate alike should stand condemned. See *Haley* v. *Ohio*, 332 U. S. 596.