EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.*
ANDRÉS RIVERA PÉREZ, acusado y apelante.

Núm. 14302.—*Sometido:* Febrero 1, 1950. *Resuelto:* Marzo 29, 1950.

*Eduardo Ortiz Reyes*, abogado del apelante; *Hon. Procurador General Vicente Géigel Polanco, J. Rivera Barreras, Fiscal del Tribunal Supremo* y *Fernando Fornaris, Jr., Fiscal Auxiliar*, abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR NEGRÓN FERNÁNDEZ emitió la opinión del tribunal.

El apelante fué convicto, por tribunal de derecho, de un delito de escalamiento en primer grado y sentenciado a una pena indeterminada de uno a quince años de presidio.

Habiéndose planteado una cuestión previa sobre falta de jurisdicción del tribunal inferior, basada en que la corte con jurisdicción para conocer de este proceso lo era la Corte para Niños, pasamos a considerarla seguidamente. Funda su contención el apelante en el hecho de haber sido sometido a un proceso por hurto menor en el tribunal inferior cuando aún no contaba 16 años de edad y haber sido por tal motivo sobreseída la causa. Entiende que una vez ocurrido esto último, quedó sujeto a la jurisdicción de una Corte para Niños, y por lo tanto, siendo menor de 21 años cuando fué sentenciado en el caso de autos, la sentencia es nula por corresponder la jurisdicción para conocer de este proceso a la Corte para Niños, de acuerdo con lo resuelto en *Torres* v. *Saldaña*, 59 D.P.R. 635.

La doctrina del caso de *Torres* no es aplicable a la situación de hechos en este caso. Allí resolvimos que la frase "o que, una vez sujeto a la jurisdicción de una Corte para Niños por las disposiciones de esta Ley, no haya llegado a la mayor edad" contenida en la definición de la palabra "niño" en la sección 8 de la Ley núm. 37, aprobada el 11 de marzo de 1915 (pág. 73), creando un sistema de cortes para niños, etc.,[1] significaba que una persona comprendida dentro de esa definición no podía ser juzgada ni sentenciada por una corte de jurisdicción ordinaria, como lo era la del distrito de San Juan. Interpretando liberalmente el estatuto llegamos a la conclusión de que las Cortes para Niños no sólo retenían jurisdicción sobre la persona del niño en el caso específico en que la habían ejercitado antes de éste llegar a los 16 años, si que también en cualquiera otro caso de ese niño hasta que llegara a su mayor edad.

Los hechos en el caso de *Torres* justificaban la aplicación de esa doctrina, ya que Torres había sido declarado niño delincuente por la Corte para Niños del Distrito Judicial de San Juan, cuando contaba sólo 15 años de edad, por un delito de escalamiento, quedando desde ese instante sujeto a la jurisdicción exclusiva de dicha corte hasta llegar a su mayor edad. Por eso, al ser sentenciado a un año de presidio por un delito de escalamiento en primer grado por una corte de jurisdicción ordinaria, antes de los 21 años, se anuló dicha sentencia, ya en ejecución, excarcelándosele y poniéndosele a disposición de la Corte para Niños correspondiente.

---

[1] Dicha sección 8, en lo pertinente, dispone:

"Para los fines de esta Ley, la palabra 'padres' o 'padre' significa uno o ambos como fuere compatible con el propósito de la misma; la palabra 'niños' o 'niño' comprende uno o más, como fuere compatible con el propósito de esta Ley, y comprenderá, a menos que de otro modo se consigne específicamente, cualquier niño en la Isla de Puerto Rico menor de diez y seis años de edad, *o que, una vez sujeto a la jurisdicción de una Corte para Niños por las disposiciones de esta Ley no haya llegado a la mayor edad. . .*" (Bastardillas nuestras.)

Los hechos del presente caso son distintos. Aquí la Corte para Niños nunca asumió jurisdicción sobre la persona del apelante en el caso por el que se le acusó en el tribunal inferior antes de tener 16 años. Siendo ello así, no puede invocarse la jurisdicción exclusiva de la Corte para Niños bajo la doctrina del caso de *Torres* para derrotar la jurisdicción de la corte inferior, que fué válidamente ejercitada en este caso.

Pasemos ahora a examinar los errores señalados.

 La prueba que tuvo ante sí el juez inferior, según la resume correctamente en su alegato el Fiscal Auxiliar de este Tribunal, fué la siguiente:

"La prueba de cargo tendió a demostrar que en la noche del 10 al 11 de noviembre de 1948, Sixto Sierra Flores tenía un negocio de friquitín en la ciudad de San Juan; que en dicho negocio tenía un radio valorado en $45; que a las 7:30 de la noche del 10 de noviembre cerró su establecimiento, y al regresar al mismo a la mañana siguiente, encontró que la puerta había sido desarrajada (sic) y que le faltaba el radio 'Westinghouse'; un cuchillo de cocina y otros enseres; que allá para el 12 de noviembre de 1948, un muchacho llamado Miguel A. Soto (*a*) Sarnita le vendió a Rafael Ramos Méndez el radio 'Westinghouse' por la suma de $20; que en dicha ocasión, el acusado Andrés Rivera Pérez no estaba con Sarnita; que en la misma noche de los hechos, el acusado, a quien también se le conoce como 'Jr.', fué llevado al Cuartel de la Detective y allí explicó que en la noche del suceso, había penetrado en un friquitín en unión a Miguel Ángel Soto Rivera, Ismael Vázquez y Luis Bermúdez, que habían llevado a cabo la penetración de 12:00 a 1:00 de la mañana, y se habían llevado un radio, un cuchillo y se habían comido unas frituras; que el acusado llevó al detective William Fernández al sitio donde habían vendido el radio, y dicho detective procedió a ocuparlo; que el acusado fué dejado en libertad para que cooperara con la detective, y en efecto, al día siguiente, ayudó y cooperó en el arresto de Miguel Ángel Soto Rivera y de Ismael Vázquez; que Ismael Vázquez, al igual que el acusado, admitió que habían penetrado en el friquitín y se habían llevado un radio, un cuchillo y unas frituras.

"La prueba de defensa tendió a demostrar que el acusado se personó en el destacamento de la Policía y allí informó que los muchachos ésos lo iban a involucrar en el asunto del escalamiento y que él deseaba cooperar y ayudar en el arresto de ellos; que el acusado ayudó al policía José A. Torres a arrestar a Ismael Vázquez; que igualmente ayudó al policía Hiram Vélez en la aprehensión de Sarnita; que al acusado lo amenazaron desde la jaula en el Cuartel, advirtiéndole los que estaban encerrados en ella que le pagaría de una manera u otra la pocavergüenza que les había hecho; que el acusado en momento alguno le hizo manifestaciones de clase alguna al detective William Fernández en relación con los hechos que se le imputaban en la acusación; que el detective William Fernández le dijo al acusado que lo soltaría si cooperaba con ellos; que en efecto lo soltó."

La prueba a que dió crédito el juez inferior es suficiente para sostener la convicción habida. Y nada hay en el récord que justifique la imputación de pasión, prejuicio y parcialidad. El error en ese sentido, que es el tercero en el orden de señalamiento, no existe. Las preguntas formuladas por el juez a los testigos iban dirigidas a esclarecer los hechos, y nada más.

■■ El apelante señala como error la alegada actuación incorrecta del fiscal, perjudicial al acusado, consistente en haber traído a conocimiento del tribunal una declaración que no estaba en evidencia. No estamos conformes. Del récord aparece que el apelante ocupó la silla testifical en su propia defensa, y al contrainterrogarle el fiscal, éste le preguntó si él (el acusado) había oído a Luis Bermúdez (un co-autor) declararle al fiscal, delante del acusado, que "Sarnita", Vázquez, el acusado y Bermúdez habían roto el candado y se habían llevado un cuchillo de cocina y un radio. El apelante contestó que no había oído esas palabras. El apelante había declarado en el interrogatorio directo, a preguntas de su abogado, que estando él en la esquina de las calles San José y Sol de San Juan, había visto bajar a Bermúdez, en compañía de otro, con un paquete, y que él les

había incriminado con las palabras "ajá, están robando", a lo cual replicaron los otros "si nos denuncias te metemos en este caso".

Sabido es que manifestaciones hechas por un coautor en presencia del acusado sin que éste las niegue o impugne, son admisibles en evidencia. *Pueblo* v. *Gelpí*, 59 D.P.R. 556; Underhill's *Criminal Evidence*, sec. 259, pág. 489 *et seq.* Si el acusado hubiera admitido que oyó dichas manifestaciones, el fiscal hubiera podido continuar su contrainterrogatorio y tratar de obtener una admisión de que no las había negado o impugnado. Si el acusado hubiera sostenido que las negó, entonces el fiscal, en su turno de prueba de refutación hubiera podido contradecirlo. Pero lo cierto es que el acusado negó que las hubiera oído, y por lo tanto no existía base alguna para que se presentara prueba de refutación. No se cometió, pues, el error imputado.

 Sostiene, por último, el apelante, que la corte inferior cometió error al permitir la declaración del detective William Fernández sobre admisiones del acusado que equivalían a una confesión de culpabilidad, sin que el fiscal demostrara previamente que la misma fué hecha voluntariamente y no bajo la influencia de promesas o amenazas.

Durante el transcurso del examen directo por el fiscal al testigo de cargo William Fernández, ocurrió el siguiente incidente: (T. E. 8)

"P. Si Andrés Rivera Pérez, acusado en el día de hoy, le hizo alguna admisión la dice.

R. Se llevó a la detective y explicó que esa noche. . .

P. ¿Quién?

R. Jr. Andrés Rivera Pérez explicó que esa noche él se había, en unión a Miguel Ángel Soto Rivera, Ismael Vázquez y Luis Bermúdez, habían penetrado en un friquitín.

P. ¿A qué hora?

R. De doce a una de la mañana. Se habían llevado un radio, un cuchillo y se habían comido unas frituras. Entonces él me llevó donde había vendido el radio. Yo ocupé el radio."

Convenimos con el apelante en que las anteriores manifestaciones del acusado al detective constituyen, en efecto, una confesión de culpabilidad, y que no son meras admisiones. Las mismas son un reconocimiento absoluto del delito imputádole. En tal virtud, debe aparecer de la prueba que fueron hechas voluntariamente y no bajo la influencia de promesas o amenazas. El acusado niega que hiciera las manifestaciones aludidas. Por otro lado, insinúa que el detective le prometió "soltarlo" si cooperaba con él. Pero estamos convencidos, luego de un detenido examen del récord, que de éste surge con razonable claridad que dichas manifestaciones fueron, en efecto, vertidas por el acusado espontáneamente, sin que, al momento de hacerlas, hubiere habido siquiera oportunidad de prometerle inmunidad 'o privilegios, o que se le hubiere sometido a coacción. Fué después de manifestar el acusado al detective William Fernández que en unión a otros había penetrado en el sitio escalado y se habían llevado un cuchillo y un radio, que el acusado llevó al detective al sitio en que habían vendido el radio. Y fué *después* de haber hecho el acusado tales manifestaciones, que le pidió al detective que lo dejara en libertad para cooperar en el arresto de los otros, a lo que aquél accedió. Bajo estas circunstancias, no podría con éxito sostenerse que el hecho de que se dejara al acusado en libertad le indujo a confesar. Véase a ese único efecto *United States* v. *Mitchell*, 322 U. S. 65, 88 L. ed. 1140.

Nada hay en la prueba que indique que mediara violencia o amenaza con anterioridad al momento en que el acusado confesó. Tampoco está presente ninguna de las circunstancias que pudiera justificar un rechazo de dicha confesión, según las decisiones del Tribunal Supremo Nacional en *Watts* v. *Indiana*, 338 U. S. 49, 93 L. ed. 1435; *Harris* v. *South Carolina*, 338 U. S. 68, 93 L. ed. 1440; *Turner* v. *Pennsylvania*, 338 U. S. 62, 93 L. ed. 1444; *Haley* v. *Ohio*,

332 U. S. 596, 92 L. ed. 224; *Ashcraft* v. *Tennessee*, 322 U. S. 143, 88 L. ed. 1192 y *Chambers* v. *Florida*, 309 U. S. 227, 84 L. ed. 716.

Apareciendo del récord que la confesión del apelante fué voluntariamente hecha, no podemos convenir con él en este señalamiento de error.

*Procede confirmar la sentencia.*