UNITED STATES of America,
Appellee,

v.

Edward PRAVATO, Joseph Sullivan, Joseph Dellamura and Barbara Ann McIvor, Appellants.

No. 371, Docket 26307.

United States Court of Appeals
Second Circuit.

Argued June 17, 1960.

Decided Sept. 23, 1960.

Richard Owen, New York City, for appellants Edward Pravato, Joseph Sullivan and Joseph Dellamura.

John W. Barnum, New York City (Kenneth W. Dam, New York City, on the brief, and Anthony F. Marra, New York City, attorney-of-record), for appellant Barbara Ann McIvor.

Edward R. Cunniffe, Jr., Asst. U. S. Atty., New York City (S. Hazard Gillespie, Jr., U. S. Atty., for Southern District of New York, and Gideon Cashman, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before WATERMAN, MOORE and HAMLIN, Circuit Judges.

MOORE, Circuit Judge.

On April 27, 1959, an armed robbery occurred at the Greystone Branch of The First National Bank in Yonkers, New York. Five persons were indicted, Joseph Dellamura, Edward Pravato, Joseph Sullivan, Joseph Anselmo and Barbara Ann McIvor. Count One charged a conspiracy to steal (18 U.S.C. §§ 371, 2113) and Count Two the taking of some $49,-000 (18 U.S.C. §§ 2, 2113(a)). Before trial the indictment against Joseph Anselmo was severed. The trial, by the court, without a jury,[1] resulted in the conviction of the four remaining defendants. From the judgment of conviction all four defendants appealed. Upon motion, counsel were assigned by the court

---

1. The trial was commenced before Judge Palmieri and a jury. A mistrial was declared on the first day. By stipulation of all parties, a new trial before Judge Palmieri without a jury was begun the next day, the transcript of the first day being incorporated therein.

to represent the respective defendants. Prior to argument of the appeal, counsel, assigned by this court to represent the defendant Dellamura and by the trial court to represent the defendant Sullivan in a motion for permission to withdraw, stated that he had carefully studied the trial record and had found no point that he could conscientiously urge as reversible error on appeal. He also advised the court that he had conferred with trial counsel for Dellamura and Sullivan, respectively; that he had been told by them that they knew of no basis for an appeal; and that he wished to be relieved of his assignment. Assigned counsel for defendants McIvor and Pravato argued their appeals.

*McIvor*

Barbara Ann McIvor bases her appeal upon the admission in evidence against her of a statement (sometimes referred to as a "confession") asserted to have been involuntary and upon the alleged failure to take her promptly before a Commissioner. Two opportunities were given her to support the contention as to the statement, the first by pre-trial motion to suppress, the second upon the trial. Upon the pre-trial motion, Barbara, three F.B.I. agents and an Assistant United States Attorney testified. The court denied the motion to suppress. The proof established in substance the following facts. On May 20, 1959, two Yonkers detectives went to Barbara's hotel room in Yonkers at about 10:00 A.M. to question her. She accompanied them to the Yonkers police station. While there she was interrogated between 1:25 P.M. and 4:00 P.M. by two F.B.I. agents. She then returned home. The next morning the two Yonkers detectives again took her to the Yonkers police station. From there she and the defendant Anselmo were driven to the White Plains Court House. Released some time after 4:30 P.M., upon arrival at her Yonkers hotel she was requested to return to the police station for questioning by F.B.I. agents. Between 6:10 P.M. and 6:40 P.M., Barbara made incriminating statements to the F.B.I. agents on the basis of which at about 6:50 P.M. the agents placed her under arrest. She was then driven to the New York office of the F.B.I. where further questioning continued. During the course of the evening a written statement consisting of 12 longhand pages was prepared, based upon her oral statements. Barbara signed the statement at approximately 11:45 P.M. She was fingerprinted and photographed at the F.B.I. office and because arraignment that night was not possible, she was lodged in the Women's House of Detention. The following morning she was taken to the United States Attorney's office and then to the Commissioner's office where she was arraigned about noon. There was testimony that the Commissioner advised her of her right to have counsel and a hearing; that anything said could be used against her; and that she replied that she was guilty and didn't need a lawyer.

On June 3, 1959, Barbara testified before the Grand Jury. The minutes disclose that she was first told that under the Constitution she could refuse to answer any questions if her answers might tend to incriminate her and that she was entitled to speak to a lawyer of her own choice.

On June 25, 1959, the above mentioned hearing upon a motion to suppress was held. Barbara, Agents Lynch, O'Keefe, Foley and Assistant United States Attorney Moran testified. The facts relating to her interviews with the F.B.I. agents on May 20th and 21st, the events on these dates in the Yonkers police station and the signing of the statement on May 21st, were developed by examination and cross-examination. At the conclusion of the hearing the court denied the motion, stating that

"The law is clear that even where the confession is not made until after the arrest, questioning for three or four hours does not render the statement inadmissible, provided that at the early part of the questioning there is an admission if [sic] implication which makes further questioning reasonable.

"I believe the testimony of the F.B.I. agents that she did make a statement implicating herself before she was arrested, * * *".

Barbara's counsel, citing many decisions[2] based upon facts quite different from the present case and then arguing similarity of principle, maintained that her F.B.I. statement was given because of "psychological coercion," "the application of pressure," deprivation of food, and was made by "an uneducated, unsophisticated and very sick girl in an advanced state of pregnancy." Barbara did not testify upon the trial. The court, however, read the complete minutes of the hearing on the motion to suppress and stated "that those minutes will be deemed to be a part of the record in this case." In addition the interviewing F.B.I. agents testified. After hearing and weighing all the evidence, the trial court admitted the statement. This appellant now asks the reviewing court to declare, in effect, that there is no adequate factual basis for the trial court's conclusion. The record rather clearly reveals the facts which were before the court.

Apparently at 10:00 A.M. on May 20, 1959, two detectives of the Yonkers Police Department awakened Barbara in her hotel room in Yonkers and took her to the Yonkers police station where she was questioned by Yonkers police. F.B.I. agents did not appear on the scene until approximately 1:30 P.M. when Agents Lynch and O'Keefe, together with a Yonkers police captain, questioned Barbara about the bank robbery until 4:00 P.M.

Prior to the F.B.I. interrogation, she was advised of her right to counsel and that it was not necessary for her to answer questions. Her pregnancy being noted, inquiry as to her physical condition elicited the answer that she felt "well and fine." Agent Lynch reduced to statement form the information obtained and asked Barbara if she would sign it. She said she preferred not to sign and did not. She thereupon left the police station and went home.[3] Before leaving she was asked whether she would be available for a further interview in case they wished to talk to her again. She indicated assent but no further appointment was made.

About 10:00 A.M. on May 21st the Yonkers police again called at Barbara's hotel. Further questioning by the Yonkers police and by the District Attorney's office continued during the day. In the latter part of the afternoon she returned to her hotel.

The F.B.I. did not see Barbara again until about 6:00 P.M. on May 21st when Agent O'Keefe and a Yonkers police sergeant saw her at her hotel and requested that she accompany them to police headquarters to talk over the bank robbery case. At headquarters F.B.I. Agents O'Keefe and Foley and the Yonkers police captain were present. After an interview of about 45 minutes on the basis of incriminating oral statements, the F.B.I. placed Barbara under arrest. She was then taken by Agents O'Keefe and Foley to F.B.I. headquarters in New York where between approximately 8:00

**2.** Amongst others, Blackburn v. State of Alabama, 1960, 361 U.S. 199, 80 S.Ct. 274, 282, 4 L.Ed.2d 242 (mental illness, confession probably "not the product of any meaningful act of volition"); Spano v. People of State of New York, 1959, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (deception practiced to obtain confession, requested opportunity to consult counsel denied); Payne v. State of Arkansas, 1958, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (defendant incommunicado three days without counsel, threats of mob violence); Watts v. State of Indiana, 1949, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (defendant held six

days without arraignment, counsel or advice as to constitutional rights); Turner v. Commonwealth of Pennsylvania, 1949, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (defendant held five days without arraignment, counsel or advice as to constitutional rights); Harris v. State of South Carolina, 1949, 338 U.S. 68, 69 S. Ct. 1354, 93 L.Ed. 1815 (defendant illiterate, held three days without advice as to constitutional rights, threats made to induce confession).

**3.** She was separated from her husband and apparently living in a hotel room in Yonkers.

P.M. and 11:30 P.M. a written statement based upon information furnished by her was prepared by the Agents, given to her to read and then signed by her. Before signing, she was again advised of her right to counsel and her privilege to refuse to sign. The subsequent events were described by F.B.I. agents and the Assistant United States Attorney in charge of the case as in the preliminary hearing. Because of the claim that Barbara could not read without glasses, the trial court obtained an eye specialist who examined Barbara and testified that without glasses she could read the handwritten statement signed by her.

There would appear to be no ground for claiming that Barbara's admissions, made on May 21st between 6:10 and 6:50 P.M. to the agents of the F.B.I., or the statement signed by her just before midnight that day, were involuntary. Although she had been interrogated by local officers on May 20th and on May 21st, and also by F.B.I. agents, the record is devoid of any proof that there was any working arrangement between the F.B.I. and the Yonkers police as to the police pickups and questionings or as to the trip to the Westchester County District Attorney's office on May 21st. The F.B.I. agents, though they interrogated her during the afternoon of May 20th, did not again interview her until after 6:00 P.M. on May 21st. Their questioning of some 45 minutes at that time elicited the information that led to her arrest. Though she had refused to sign a statement prepared on May 20th, before her arrest, she did sign one during the evening of May 21st, after the arrest. The record does not disclose any ill treatment on either day—in fact, during the evening of the 21st she was in the company of F.B.I. agents at mealtime. They asked her what she desired, she chose a hamburger and milk. The food she requested she received. Her own comments as to the treatment she received from the F.B.I. are significant. She stated they were "nice and polite."

The next point raised is based upon alleged unnecessary delay (Rule 5(a),

Federal Rules of Criminal Procedure, 18 U.S.C.). The facts fail to support this contention. Barbara was arrested at approximately 6:50 P.M. on May 21st. She could not have been arraigned that night. The arrest was made upon incriminating statements. The events thereafter and the reduction of the statements to writing consumed a few hours. In no sense were they used "for the extraction of a confession" (Mallory v. United States, 1957, 354 U.S. 449, 455, 77 S.Ct. 1356, 1360, 1 L.Ed.2d 1479). The night had to be spent in the Women's House of Detention. Being under arrest, she was not free to return to her hotel. After an interview in the United States Attorney's office the following morning, she was taken before a Commissioner.

■ Upon all the evidence, the trial court was justified in holding the statement admissible as neither involuntary nor taken after unnecessary delay. His conclusion of guilt was amply supported by the facts in the statement, the Grand Jury minutes and the witnesses' testimony.

*Pravato*

■■ Pravato bases his appeal upon inadequacy of evidence to support conviction under the indictment for bank robbery, conspiracy and aiding and abetting (18 U.S.C. §§ 2, 371, 2113) and upon an alleged misquotation of testimony by government counsel. As to misquotation the record is clear that the most that can be urged is that Pravato joined in Sullivan's threat to harm the Perretti children by saying, "Yes, yes, yes" or "Yea, yea, yea." When defense counsel denied that any such statement had been made, the trial court said that he didn't recall it, would have to refresh his recollection and would look at the testimony very carefully. In any event, this incident (Sullivan's threat) occurred after the robbery. Pravato upon substantial evidence was held to be guilty as aiding and abetting in planning the robbery. No reversible error resulted to Pravato's prejudice from the prosecutor's remarks. There was testimony that about the middle of April, 1959, Pravato, Dellamura and Sul-

livan had gone to a bank and that Dellamura and Pravato had gone inside to look it over. Subsequently it was suggested (by one of the three) that Dellamura take a Mrs. Perretti and her child to the bank in Yonkers so that "nobody would surmise anything." During the evening of April 26, 1959, and while at the home of Mrs. Perretti, Pravato, Dellamura and Sullivan went out to Dellamura's car and brought in various articles wrapped in coats, namely, a little gun, a shotgun, a glove, a stocking and a tire jack. Sullivan toök off part of the jack, saying he wanted it to pry open the bars in the bank. The three then wrapped these objects in their coats, Pravato wrapping the little gun, the shotgun, a black glove and a stocking. The destination stated was the Yonkers Bank. After the robbery Pravato continued to be in association with Dellamura and Sullivan at the home of Mrs. Perretti. From this and other circumstantial evidence the trial court concluded that, although there might be reasonable doubt as to whether the evidence was sufficient to establish actual presence at the Bank at the time of the robbery, nevertheless Pravato "knowingly and wilfully participated in the conferences, the planning that preceded the crime, that he assisted the defendants Dellamura and Sullivan in planning for that crime and in wrapping the very guns that were utilized in the commission of the crime." The Court's judgment of guilt on both counts, conspiracy and the substantive offense as an aider and abettor is supported by substantial evidence.

*Dellamura and Sullivan*

■ In view of the statement of court-assigned counsel in his motion to withdraw that after reading the record three times he was unable to find any error or appealable issue as to the defendants Dellamura and Sullivan, each member of this panel has read the entire stenographic transcript of the trial. Each Judge is of the opinion that there is ample evidence to justify the conviction of Dellamura and Sullivan and that there were no errors upon the trial.

■ In Ellis v. United States, 1958, 356 U.S. 674, 675, 78 S.Ct. 974, 975, 2 L. Ed.2d 1060, the Supreme Court (*per curiam*) stated, "If counsel is convinced, after conscientious investigation, that the appeal is frivolous, of course, he may ask to withdraw on that account. If the court is satisfied that counsel has diligently investigated the possible grounds of appeal, and agrees with counsel's evaluation of the case, then leave to withdraw may be allowed and leave to appeal may be denied." The Ellis case involved an application to appeal *in forma pauperis*. Thereafter in Porter v. United States, 5 Cir., 1959, 272 F.2d 695, the Fifth Circuit was faced with a situation identical with that of Dellamura and Sullivan, i. e., after an appeal from a judgment of conviction had been perfected and court-appointed counsel after careful review had found no reversible error. There, after each of the three judges had "carefully read and considered the entire record and [had] become satisfied that counsel [had] diligently investigated any possible grounds of appeal," the court agreed with counsel's evaluation, granted the motion to withdraw and pursuant to Rule 39(a), Federal Rules of Criminal Procedure dismissed the appeal. Though we could adopt the same procedure we are of the opinion that the convictions below should be affirmed rather than that the appeals should be dismissed. The motion öf counsel for Dellamura and Sullivan for leave to withdraw is granted. The judgments of conviction of Pravato, McIvor, Dellamura and Sullivan are affirmed.

The Court expresses its appreciation to assigned counsel for their able briefing and presentation of their arguments on behalf of the defendants represented by them.