

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  | § |  |
| --- | --- | --- |
| THE STATE OF TEXAS, | § | No. 08-16-00273-CR |
|  | § |  |
| Appellant, | § | Appeal from |
|  | § |  |
| v. | § | 83rd District Court |
|  | § |  |
| JULIAN ANDREW LUNA, | § | of Pecos County, Texas |
|  | § |  |
| Appellee. | § | (TC # P-3208-83-CR) |
|  | § |  |

**DISSENTING OPINION**

The majority holds that deputies' threats to charge Luna's family were not coercive on the basis that deputies were making truthful statements and providing an "accurate representation" of the situation Luna faced at the time he was questioned during his second interview. More specifically, the majority holds that statements made by Luna himself would have given a reasonably prudent police officer probable cause to believe that Luna's wife and other family members were subject to lawful arrest for a charge of murder as parties to the offense. Unlike the majority, I would conclude that the State failed to meet its burden of proving that probable cause existed to lawfully charge family members at the time deputies made their threats to do so. On review of Luna's statement, I would find that the evidence supports the findings of fact and conclusions of law made by the trial court. Luna describes himself as having been tackled to the

ground unexpectedly, and while he struggled underneath Ruben Salazar, his family members tried helping him with their hands. Luna repeatedly denied that he or any of his family members had a knife or otherwise committed a stabbing. Deputies told Luna they did not believe him and threatened to charge his family members. On appeal, the State candidly asserts in briefing that "[o]nly when the Defendant confessed to stabbing Salazar did the deputies have enough probable cause to arrest him." Given this record, I fail to see how Luna's denials and descriptive statements of the incident made before he confessed to stabbing could lead a reasonably prudent officer to charge his family members, as parties, to the same offense for which they lacked probable cause to charge Luna. Like the trial court, I would conclude that the State failed to meet its burden to prove the voluntariness of the recorded statement Luna provided to deputies at the Fort Stockton station. Respectfully, I dissent.

## Factual and Procedural Background

Deputies investigating the stabbing of Ruben Salazar faced a complex legal and factual scenario, hours after being called in to investigate. Viewing the record in favor of the trial court's decision, it shows that Luna had called 911 reporting he had been "jumped" as he and his family members were hanging out together, after two a.m., outside his home. During questioning, Luna described he was on the ground struggling underneath Ruben Salazar when he felt his family members trying to help him with their hands. Luna denied he had committed a stabbing or seeing anyone else with a knife, but deputies told him they did not believe him. .

Luna's motion to suppress asserted he felt threatened by deputies that his wife, her sister, and her cousin, would all be charged as parties to the crime of murder—and his children would be removed from him—unless he changed his story from denying that he stabbed Ruben Salazar to admitting that he did so. Luna asserted that the method of questioning used by the deputies was calculated to produce an untruthful confession and was offensive to his rights to due process. Luna

2

brought his motion pursuant to Article 38.21 and Article 38.22, Section 6, of the Texas Code of Criminal Procedure.

After the hearing concluded, the trial court found that Luna denied he stabbed Ruben Salazar when questioned by Deputies Galvan, Perkins and Evans, at the Pecos County Sheriff's Office in Fort Stockton; that Luna had a seventh-grade education and did not understand his constitutional rights regarding giving a statement; that deputies Galvan and Perkins repeatedly told Luna that they did not believe him; and, that deputies Galvan and Perkins threatened to arrest Luna's wife, her sister and her cousin, and to take his children away unless he confessed to stabbing Ruben Salazar  Additionally, the trial court included both a finding of fact and a conclusion of law that addressed the question of whether the deputies had established probable cause to believe that Luna's wife, her sister or her cousin were involved in the stabbing or death of Ruben Salazar.  The trial court concluded that these deputies lacked probable cause to believe that Luna's family were involved in the stabbing or death of Ruben Salazar.  Ultimately, the court found the statement was not made voluntarily due to constitutional violations.

On appeal, the State plainly admits that probable cause had not yet arisen to charge Luna at the time that deputies were questioning him.  On this basis, the State asserts that Luna was not in custody when questioned at the Fort Stockton station.  Despite lacking probable cause to charge Luna, the State asserts there was probable cause to charge his family members not as principal actors but as parties to Luna's conduct.  Thus, the State asserts that deputies were giving accurate information to Luna given their claim that he had incriminated his wife and family members with his description of events at his house.

*Controlling Law*

Article 38.21 provides that statements may only be used against a defendant if "freely and voluntary made without compulsion or persuasion . . . ." TEX.CODE CRIM.PROC.ANN. art. § 38.21.

3

As a corollary, Article 38.22, Section 6, provides, "[i]n all cases where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions." TEX.CODE CRIM.PROC.ANN. art. 38.22 § 6. The introductory phrase "in all cases," has been construed by the Texas Court of Criminal Appeals as applying to *both* custodial and non-custodial statements of an accused. *State v. Terrazas*, 4 S.W.3d 720, 727 (Tex.Crim.App. 1999). Because Article 38.22, Section 6, applies regardless of custodial status, the fact that Luna was not in custody when questioned does not defeat his claim of involuntariness. *Terrazas*, 4 S.W.3d at 727.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. The privilege against self-incrimination is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964)(the admissibility of a confession is tested the same in a state prosecution as in federal cases); U.S. CONST. amend. XIV. Under a parallel provision, the Texas Constitution similarly states: "[i]n all criminal prosecutions the accused . . . shall not be compelled to give evidence against himself." TEX. CONST. art. I, § 10.

The constitutional inquiry questions not whether the conduct of state officers in obtaining a confession was shocking, but whether the confession was free and voluntary—that is, it must not be "extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Malloy*, 378 U.S. at 7, 84 S.Ct. at 1493 (citing *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). "[A] confession obtained by police through the use of threats is violative of due process and that 'the question in each case is whether the defendant's will was overborne at the time he confessed.'" *Haynes v. State of Wash.*, 373 U.S. 503, 513 (1963)(citing *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)). Regardless of the

form, allegations of coercive police conduct must be causally related to the confession to constitute a violation of due process. *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex.Crim.App. 1995)(citing *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)). The ultimate test of voluntariness questions whether a confession is the product of an essentially free and unconstrained choice by its maker. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-226 (1973). "If [a defendant] has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Id.* (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).

In *Contreras v. State*, the Court of Criminal Appeals recognized that two United States Supreme Court cases, *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963), and *Harris v. State of South Carolina*, 338 U.S. 68, 69-71 (1949), ruled that threats against family members could result in an involuntary confession. *Contreras v. State,* 312 S.W.3d 566, 577 (Tex.Crim.App. 2010). *Lynumn* found involuntary a confession of a mother who had been threatened by police officers that her children would be taken away from her unless she admitted her involvement in selling marijuana. *Lynumn*, 372 U.S. at 534. Similarly, in *Harris*, the Supreme Court reversed a conviction based on a confession after a sheriff investigating a murder threatened to arrest the accused's mother and charge her with handling stolen property. *Harris*, 338 U.S. at 69-71. In certain circumstances, threats to charge family members, or to remove children, are recognized forms of police coercion that can result in a confession being rendered involuntary. *Lynumn,* 372 U.S. at 534; *Harris*, 338 U.S. at 69-71; *Terrazas*, 4 S.W.3d at 732-33.

Not all threats made during an interrogation, however, are prohibited as officers are permitted to make truthful statements. *Contreras* noted that various federal and state courts have further held that "law enforcement officials can threaten to arrest a family member, without

vitiating the voluntariness of a confession, if they can lawfully effectuate such an arrest (i.e., if there is probable cause to arrest)." *Contreras*, 312 S.W.3d at 577 (collecting cases from various jurisdictions). Post *Contreras*, at least one of our sister courts reached the merits of a probable cause inquiry and concluded that threats by law enforcement to arrest a defendant's family member did not render a confession involuntary where it was adequately shown that there was probable cause to carry out the threat of arrest under the circumstances. *See, e.g., Diaz v. State*, No. 13-14-00675-CR, 2017 WL 4987665, at \*5 (Tex.App.—Corpus Christi Nov. 2, 2017, pet. ref'd)(not designated for publication)(where police had probable cause to believe that defendant's parents were responsible for hindering the defendant's apprehension, defendant's confession was not rendered involuntary where the police advised the defendant of the possibility that his parents could be arrested); *cf. United States v. Nuckols*, 606 F.2d 566, 569 (5th Cir. 1979)(federal prosecutors threats to prosecute defendant's wife must be grounded in good faith upon probable cause). Where officers can lawfully effectuate an arrest based on probable cause against a threatened family member, the State meets its burden of showing that a confession's voluntariness has not been vitiated by coercive questioning. *See Diaz,* 2017 WL 4987665, at \*5.

## Analysis

### 1. Defendant's Burden to Show Lack of Voluntariness

Viewing the evidence in the light most favorable to the trial court's ruling, as required on appeal, I would conclude that the court's finding of a threat to charge Luna's family, as well as threatening to remove his children from him and his wife, coupled with findings on characteristics pertaining to his vulnerability—his low educational achievement and lack of understanding of his rights—all are reasonably supported by the record, and themselves support a conclusion that Luna had raised a question of the voluntariness of his statement. *See Lynumn,* 372 U.S. at 534; *Harris*, 338 U.S. at 69-71; *Terrazas*, 4 S.W.3d at 732-33; *Romero v. State,* 800 S.W.2d 539, 544 fn. 7.

6

Deputy Galvan stated to Luna, "Let me tell you how this is – how this is going to go down." Posing a contingency, Galvan described that if the handle came back as having Luna's DNA and blood, in that case not only was Luna there but so were his family members and they could all be charged with murder as parties to the offense. Luna immediately questioned, "But how—how are—how are they going to go down for murder when there's –like you're taking the drunk people's as, you know. . . ." Interrupting, Deputy Galvan replied, "Because you got in a fight with him; you stabbed him—." Luna replied, "We're telling them to leave from my house, telling them ten times, multiple times, multiple times. And for him to get out with a baseball bat? Don't you think I'm lucky for not getting killed? I didn't even do nothing. We're scuffling. Why would he get a baseball bat?" Later, Deputy Galvan accused Luna and his family of stabbing Ruben stating, "one of four people stabbed that man and killed him, you, your wife, her sister or her cousin." Again, Luna clarified they only used their hands to help him after he was being attacked.

The record shows that Luna exhibited characteristics showing he could be susceptible to being coerced. Although twenty-six years old at the time, Luna described that he had dropped out of school in the seventh-grade, he barely knew how to read, and he was not able to write well. Luna testified he had never been in a situation like he was in during his interview with the officers. He described he was very scared, but he felt he could not walk out of the interview. Instead, he changed his story. Luna testified he was scared by the threats against his family and he confessed to stabbing Ruben Salazar. The surrounding circumstances showed that three police officers were questioning him, he had described himself as having a minimal educational record, and he had no reason not to believe that police had ample power to carry out any threats they would make regarding his family members. In *Schneckloth*, the U.S. Supreme Court recognized that lack of education is a factor considered under the totality of circumstances when assessing voluntariness

of a confession. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041, 2047, 36 L. Ed. 2d 854 (1973)(citing *Payne v. Arkansas*, 356 U.S. 560, 567, 78 (1958)).

Contrary to the State's argument, I would conclude that these threats were made close enough in time during the interview to be causally related to the issue of voluntariness.[1] *See generally Contreras v. State*, 312 S.W.3d 566, 574 (Tex.Crim.App. 2010)(a statement is obtained in violation of constitutional due process only if the statement is causally related to coercive government misconduct)(citing *Colorado v. Connelly,* 479 U.S. 157, 163-64 (1986); *Oursbourn,* 259 S.W.3d at 169-71. On review, I would conclude that the record supports the court's finding that Luna met his initial burden to show lack of voluntariness. Thus, the burden of proof then shifted to the State to prove the deputies could lawfully effectuate an arrest of Luna's family members at the time they threatened to do so. *See Terrazas*, 4 S.W.3d at 727 (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997); *Romero v. State,* 800 S.W.2d 539, 544 fn. 7 (Tex.Crim.App. 1990).

### 2. State's burden to Show Probable Cause to Charge Family Members

On appeal, the State argues that deputies' statements to Luna were not overreaching or coercive, but instead, amounted to an accurate representation of Luna's predicament. More specifically, the State argues that deputies formed probable cause against Luna's three family members because of the law of parties. .

---

[1] The State contends that Luna's confession came several minutes after the deputies made their threats to arrest Luna's family members, and that his confession came shortly after Luna and the deputies began discussing the possibility that he had acted in self-defense. Although the threats may have been made several minutes before Luna confessed, this does not foreclose the possibility that the threats had an impact on Luna's decision to confess. In fact, shortly after he confessed. Luna complained that the detectives had been threatening to arrest his family earlier in the interview. Further, during the suppression hearing, Luna expressly testified that he generally felt "threatened" during the police interviews in part due to the deputies' threats to arrest his family members and to take away his children, and that the threats had an "impact" on his decision to change his "story" during the interview.

To effectuate an arrest, an officer must have probable cause to believe the person he is arresting has committed or is committing an offense. *See Amores v. State*, 816 S.W.2d 407, 411 (Tex.Crim.App. 1991). Probable cause exists when "the facts and circumstances within the officer's knowledge and of which (he) had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the (arrested) person had committed or was committing an offense." *See Nelson v. State*, 848 S.W.2d 126, 133 (Tex.Crim.App.1992)(citation omitted); *see also Torres v. State*, 868 S.W.2d 798, 801 (Tex.Crim.App. 1993); *Rodgers v. State*, 500 S.W.3d 682, 684 (Tex.App.—Fort Worth 2016, no pet.); *Drake v. State*, No. 08-99-00063-CR, 2001 WL 893282, at *3 (Tex.App.—El Paso Aug. 8, 2001, pet. ref'd)(not designated for publication).

The test for determining probable cause is an objective one, unrelated to the subjective beliefs of the arresting officer. *See Hearrean v. State,* No. 08-13-00338-CR, 2016 WL 3021627, at *3 (Tex.App.—El Paso May 25, 2016, pet. ref'd)(not designated for publication)(citing *Amador v. State,* 275 S.W.3d 872, 878 (Tex.Crim.App. 2009)); *see also Torres,* 868 S.W.2d at 801. A finding of probable cause is based on probabilities and requires "more than bare suspicion" but "less than . . . would justify . . . conviction." *Guzman v. State*, 955 S.W.2d at 87; see also *Amador,* 275 S.W.3d at 878. Probable cause is a mixed question of law and fact. *Guzman,* 955 S.W.2d. at 87. When determining probable cause under the totality of the circumstances test, the trial judge is not in an appreciably better position than the reviewing court to make that determination. *Id.* Although great weight should be given to the inferences drawn by the trial judge and law enforcement officers, the determination of probable cause itself is reviewed *de novo* unless the issue involves the credibility of a witness. *Id.*

The doctrine of the law of parties is set forth in section 7.02 of the Texas Penal Code, which provides that an individual may be found criminally responsible for an offense committed

by another if, while acting with the "intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *See* TEX.PENAL CODE ANN. § 7.02(a)(2); *see also* TEX.PENAL CODE ANN. § 7.01 (a person is a criminally responsible party to an offense "if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both."); *Romero v. State*, No. 08-10-00074-CR, 2012 WL 3834917, at *4 (Tex.App.—El Paso Sept. 5, 2012, pet. ref'd)(not designated for publication)(discussing law of parties' doctrine). Notably, with this theory of criminal responsibility, courts recognize that mere presence at the scene of a crime, without more, is insufficient to warrant a conviction. *Gross v. State*, 380 S.W.3d 181, 186 (Tex.Crim.App. 2012).

To determine whether an individual is a party to an offense, the reviewing court may look to "events before, during, and after the commission of the offense," and may rely on circumstantial evidence to prove a party's status. *Id.* (citing *Wygal v. State,* 555 S.W.2d 465, 468-69 (Tex.Crim.App. 1977)); *Ransom v. State,* 920 S.W.2d 288, 302 (Tex.Crim.App.1996)); *see also Romero*, 2012 WL 3834917, at *4. "Collectively, a defendant's acts, words, and conduct before, during, and after the commission of an offense are probative of wrongful conduct and can constitute sufficient evidence of an understanding and common design to commit the offense." *See Perez v. State*, No. 08-12-00340-CR, 2015 WL 4940375, at *7 (Tex.App.—El Paso Aug. 19, 2015, no pet.)(not designated for publication)(citing *Guevara v. State,* 152 S.W.3d 45, 49 (Tex.Crim.App. 2004)); *see also Barrientos v. State*, 539 S.W.3d 482, 490 (Tex.App.—Houston [1st Dist.] 2017, no pet.)(the evidence must show that, at the time of the offense, the parties were acting together, each contributing some part towards the execution of their common purpose.").

At the hearing, the State presented testimony from Deputy Galvan along with the recordings of Luna's two interviews. Focusing first on Galvan's testimony, he described he had

been working on his investigation from the early morning hours of the day through the time he began interviewing Luna at three in the afternoon. Up to that point, Galvan described that he had spoken to Luna, his wife, and Albert Salazar. Galvan briefly spoke to Luna and his wife outside their home before he took photographs of the scene of the incident. Galvan revealed no details nor described whether anything said by the Luna's had been noteworthy, suspicious, or incriminating. Galvan also testified he believed he had interviewed Luna's wife a second time, but he took no notes and could not recall what was said during his second conversation. Next, Galvan described he had participated in a recorded interview of Albert. When asked whether Albert reported that Luna had stabbed Ruben, Galvan answered generally saying, "[h]e said that they had gotten into a fight." With further prompting, however, Galvan added that Luna became his main suspect from what Albert had reported but he gave no further details. Galvan also said, "everybody at the time was a suspect."

As for threatening charges against Luna's family, Galvan testified he would be able to do so because of the law of parties and "because a man had been stabbed and the four of them were all on top of him." When asked by the prosecutor if he had been told—just prior to making his threats—that Luna and the other persons he identified had been attacking, hitting, and swinging at Ruben Salazar, Galvan responded, "Yes," without elaboration. On cross-examination, defense counsel pointedly asked whether Albert mentioned the three other family members—Luna's wife, her sister, or, her cousin. Galvan responded, "No," as to each family member. .

Focusing next on Luna's statements, Luna asserted he had been tackled to the ground outside his home, in front of his family, by Ruben and Albert Salazar. Luna described he was physically taken to the ground unexpectedly by Ruben. He then felt Albert hitting his head and kicking his back. After that, Luna said that he heard his wife hitting, and she, her sister, and her

cousin, started "rolling on top of everybody." Luna could feel "my wife and her cousins try to help me." Eventually, Luna described he worked to get free once he heard a bat and feared for his life.

In full context, Luna describes himself as a victim of an unprovoked attack, late at night, at his residence. Affording almost complete deference to the trial court's determination of historical facts, especially those determinations that are based on assessments of credibility and demeanor, I would conclude that Luna made no accusations of his family committing a stabbing, or, alternatively, encouraging, aiding, or cooperating with him to commit one. *See Furr v. State*, 499 S.W.3d 872, 877 (Tex.Crim.App. 2016). Luna repeatedly said he never saw a knife before or after he was rolling around after being tackled. Through both interviews, Luna denied he himself committed a stabbing and essentially described his family members as helping him fend off an attack with their hands. Nonetheless, deputies told Luna that his family would be charged with murder, as parties, because they were all there at the time.

They described to Luna that he would not see his children except for visitation and further added, "they're not going to have a momma either." Luna encouraged deputies to speak to his family saying, "they were there. They were there running them off with me. They were there in the middle, you know, when they were jumping me. They were helping me when they were jumping me. Those people, nobody has heard from them." Deputies then claimed they had spoken to others and their stories didn't match with Luna's. At one point, Luna was asked, "Oh, so your wife stabbed him?" He responds, "No, my didn't stab him, that's for sure." Continuing to respond to this line of questioning, Luna sputters a bit while saying, "I ain't going to say none of them stabbed him – None of them stabbed him. None of them stabbed him. I ain't going to put the finger on anybody. I'm just –."

12

In context, Luna explained that Ruben and Albert arrived at his home unexpectedly. He said they were acting drunk and acting weird. He and his wife told them to leave. Deputy Perkins asked Luna, "what was the beef?" He responded, "There's no beef. There's no beef. He's a good guy." Having concerns, Luna and his wife repeatedly asked them to leave. Luna then described that his wife stated, "You need to leave, Ruben. You need to leave or I'll cut your face." Luna described that he responded to his wife saying, "Babe, move far away." As Luna continued talking he described seeing Ruben balling up his fists. Despite his wife's comment, he repeatedly denies throughout his statement that he saw his wife or anyone else with a knife before deputies threaten to bring charges for murder against his family.

Once Luna confessed to having stabbed Salazar, the conversation between him and the deputies continued for a short time. Luna expressed his concerns for his family remarking to Galvan, "you threatened my family, like they're going to go down. I don't want them to go down." Galvan replied, "Well, I mean what am I supposed to do?" Deputy Perkins interjected, "We threatened your family, but you said at first there were four people throwing punches." Luna responded, "They were – they were jumping me first, and then my friends got -- " Perkins replied, "One of your friends might have stabbed him." Deputy Evans added, "Somebody had to have done it, just out of the –." During this interrupted dialogue, none of the deputies articulated more than mere conjecture against everyone who was then present.

Given the state of the limited record on review, I would conclude it supports the trial court's conclusion that threats to charge Luna's family and to remove his children, were not supported by probable cause at the time these remarks were made during deputies' questioning of Luna. Like the absence of evidence in *Contreras*, the record here shows that neither Luna himself nor Albert Salazar told the deputies that Luna's wife, her sister, or her cousin, initiated an attack, wielded a

13

knife, or had in fact stabbed Ruben Salazar, nor acted in coordination with another to accomplish such offense. *See Contreras*, 312 S.W.3d at 577 (absence of probable cause against defendant's wife). At most, Luna described his wife and others as having helped him with their hands in defending him against the unprovoked attack of Ruben and Albert. The attack resulted in Luna being tackled to the ground, then punched and kicked in the head repeatedly. Contrary to the State's argument, Luna denied he saw anyone with a knife and repeatedly denied he could incriminate anyone in the stabbing. Most importantly, the State acknowledges in briefing that not until after Luna confessed had deputies yet to form probable cause to charge him.

Considering the totality of the circumstances and required deference to historical facts, I would conclude that the record supports the trial court's conclusion that threats to charge Luna's family and remove his children, were not supported by probable cause at the time these remarks were made to Luna during his questioning. Without probable cause having been formed by the deputies, these statements are coercive in nature as they would not qualify as an accurate representation of Luna's predicament at the time they were made by deputies. *See Contreras v. State*, 312 S.W.3d 566, 576 (Tex.Crim.App. 2010); *Harris v. State of South Carolina*, 338 U.S. 68, 70 (1949). Accordingly, I would conclude that the trial court did not err in granting Luna's motion to suppress Luna's statement made at the Fort Stockton station based on lack of voluntariness.

April 30, 2019

GINA PALAFOX, Justice