Irvin C. SCARBECK, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 16739, 16952.

United States Court of Appeals District of Columbia Circuit.

Argued June 7, 1962.

Decided Dec. 31, 1962.

Petition for Rehearing En Banc Denied En Banc Feb. 28, 1963.

As Amended March 12, 1963.

Certiorari Denied June 17, 1963. See 83 S.Ct. 1897.

548

Mr. Samuel C. Klein, Washington, D. C., for appellant.

Mr. Kevin T. Maroney, Attorney, Department of Justice, with whom Mr. Robert S. Brady, Attorney, Department of Justice, was on the brief, for appellee.

Before BAZELON, Chief Judge, and WASHINGTON and WRIGHT, Circuit Judges.

WASHINGTON, Circuit Judge.

Appellant Irvin C. Scarbeck was tried in the District Court on an indictment which charged him in three counts with communicating classified information to representatives of the Polish Government, in violation of 50 U.S.C. § 783(b), and in a fourth count with removing a document on file at the United States Embassy in Warsaw, Poland, in violation of 18 U.S.C. § 2071. After a jury trial, Scarbeck was found guilty on the first three counts, and not guilty on the fourth. He was sentenced to ten years imprisonment on each of the first three counts, to be served consecutively. Appeal was taken from the judgment of conviction. During its pendency, a motion for a new trial was made in the District Court. This was denied, and an appeal was taken from the denial. The two appeals were consolidated by order of this court.

The Government's evidence, in substance, was that appellant Scarbeck was employed in the United States Embassy in Warsaw from December 1958 until June 1961, serving as Second Secretary and General Services Officer. In September 1959 he met and thereafter became involved with Miss Urszula Maria Discher, a Polish national. He maintained an apartment for her, and visited her there almost nightly when he was in Warsaw. On the night of December 22–23, 1960, when appellant and Miss Discher were undressed and in bed together, the door was opened and several men

entered—one in the uniform of the Polish militia. One of the men had a camera and took compromising pictures. Miss Discher was then taken to the police station, where she was interrogated by Polish security police (known as the "U.B.") and threatened with expulsion from Warsaw, imprisonment for black market dealings, and forced service as a prostitute.

The facts following are derived largely (but not wholly) from appellant's statements to a security officer of the State Department and to agents of the Federal Bureau of Investigation, which were received in evidence over appellant's objection.

The appellant remained in the apartment and conversed with two other men who arrived to interview him. He was told that Miss Discher would be imprisoned, that his activities with her would have to be reported to the United States Embassy, and that his career would be finished. The men suggested, however, that if appellant furnished information and documents from the Embassy to them, they might be able to quash the report to the Embassy concerning his activities and to procure the release of Miss Discher. Appellant disclaimed having any knowledge of classified matters and stated that he would not under any circumstances give them any information which would endanger the security of the United States. He agreed, however, to meet with them again. Miss Discher was then returned to her apartment from the police station.

Appellant thereafter met with the men, whom he believed to be Polish security policemen, once a week or once in two weeks until about April 11, 1961. He first gave them unclassified documents and information obtained from unclassified material, but the men became insistent that he provide them with more important documents and information. According to appellant's statements, about five or six weeks after his first meeting with them he took to them Despatch No. 344, a document prepared by the Ambassador of the United States

and classified and marked as "Secret." The men photographed and returned this document to him in about fifteen minutes. He also provided them on other occasions with information contained in Despatch No. 518 classified and marked "Secret," and in Despatch No. 444 classified and marked "Confidential."

During his talks with the U.B. men, appellant had asked their assistance in obtaining a Polish passport for Miss Discher. Early in April 1961 Miss Discher obtained the passport and used it immediately to go to Germany. Appellant had previously arranged for the issuance of a West German visa to her, permitting her entry, and had arranged accommodations for her in Frankfurt. He paid her transportation to Germany. Before she left Warsaw, appellant mentioned to the two U.B. men his worries about her lack of funds and accepted 1600 German marks (then about $400) which they offered him. Appellant stated to them that it was a loan which he would repay. He had refused previous offers of money made by these men.

Appellant joined Miss Discher in Frankfurt about the middle of April and remained until the first week of May, when he returned to Warsaw. He was then under suspicion by his superiors, and was ordered to report on June 5, 1961, to the United States Embassy in Bonn, Germany, to attend a conference. Later that day (June 5) he was interviewed by a security official of the Department of State and signed an inculpatory statement detailing some of the facts outlined above. He returned to the United States where he was questioned by agents of the F.B.I., and where he signed three more inculpatory statements. He was arrested, indicted and tried, resulting in the conviction now under review.

## I.

▉ Appellant's initial contention raises the question of the proper interpretation of the statute under which he was convicted, 50 U.S.C. § 783(b) (1958), incorporating Section 4(b) of the Inter-

nal Security Act of 1950, 64 Stat. 991. This section provides, in pertinent part:

> "It shall be unlawful for any officer or employee of the United States or of any department or agency thereof, or of any corporation the stock of which is owned in whole or in major part by the United States or any department or agency thereof, to communicate in any manner or by any means, to any other person whom such officer or employee knows or has reason to believe to be an agent or representative of any foreign government * * * *any information of a kind which shall have been classified by the President (or by the head of any such department, agency, or corporation with the approval of the President) as affecting the security of the United States,* knowing or having reason to know that such information has been so classified, unless such officer or employee shall have been specifically authorized by the President, or by the head of the department, agency, or corporation by which this officer or employee is employed, to make such disclosure of such information." (Emphasis supplied.)

As we have seen, appellant Scarbeck was an employee of the State Department, stationed in Warsaw, Poland, from December 1958 until June 1961. He was found guilty of having communicated to Polish government agents Foreign Service Despatches numbered 344, 518 and 444 (or information contained in them); the first two Despatches had been classified and certified "Secret," and the last Despatch had been classified and certified "Confidential," by the United States Ambassador to Poland. The Ambassador

testified that these classifications were security classifications applied to information which should be protected in the interest of the national defense of the United States; and that his authority for the classifications was the President's Executive Order 10501, as amended by Executive Order 10901, and the Foreign Service Regulations based on the Executive Order.

Appellant's contention is that his conviction under Section 783(b) cannot stand because there was no showing that he had communicated the contents of any document which had been classified *personally* by the President as "affecting the security of the United States," or one that had been so classified *personally* by the Secretary of State with the approval of the President.[1]

At the outset, we note that the construction of the statute urged by appellant would largely reduce it to a dead letter. With the pressures of more urgent business, the President and the Secretary of State of necessity could personally classify very few documents or items of information. In the normal course of events a subordinate Government employee or official labels his own materials with whatever classification he deems appropriate, within the scope of his authority, and his superiors reviewing those materials later re-classify or de-classify as they may judge necessary or desirable. But in this process the great mass of documents in the State Department never will reach the Secretary of State or the President. Executive Order 10501 of November 5, 1953, 18 Fed.Reg. 7049, as amended by Executive Order 10901 of January 9, 1961, 26 Fed.Reg. 217, fully recognizes this; after defining classification categories, it provides that the authority to classify

---

1. This contention goes to the sufficiency of the indictment, which charges the appellant with having communicated, with respect to each of the three Despatches in question, "information the defendant had reason to know had been classified, under the authority of the President of the United States and the Secretary of State, as affecting the security of the

United States." It is irrelevant that this point may not have been made at the trial; it may be raised at any time. Fed. R.Crim.P. 12(b); see United States v. Manuszak, 234 F.2d 421, 422 (3d Cir., 1956); Johnson v. United States, 206 F.2d 806, 808, 14 Alaska 380 (9th Cir., 1953).

under the order may be exercised, as to the Department of State, by the head (Secretary) "or by such responsible officers or employees as he, or his representative, may designate for that purpose."

We note further that security and defense information has long been "classified" against disclosure and that the term classified by, or with the approval of, the President or a department head, had a well understood connotation on September 23, 1950, when Section 783(b) was enacted by Congress.[2] For example, Executive Order 8381 of March 22, 1940, 5 Fed.Reg. 1147, defines "vital military and naval installations or equipment * * * requiring protection against the general dissemination of information relative thereto" within the meaning of the Act of January 12, 1938, 52 Stat. 3, 18 U.S.C. § 795, as:

> "1. All military or naval installations and equipment which are *now classified, designated, and marked under the authority or at the direction of* the Secretary of War or the Secretary of the Navy as 'secret', 'confidential', or 'restricted' * * *." (Emphasis supplied.)

Executive Order 10104 of February 1, 1950, 15 Fed.Reg. 597, superseded Order 8381, and contained three numbered paragraphs defining vital military and naval installations and equipment under the 1938 Act. Most pertinent here is the following:

> "3. All official military, naval, or air force books, pamphlets, documents, reports, maps, charts, plans, designs, models, drawings, photographs, contracts, or specifications *which are now marked under the authority or at the direction of* the President, the Secretary of Defense, the Secretary of the Army, the Sec-

retary of the Navy, or the Secretary of the Air Force as 'top secret', 'secret', 'confidential' or 'restricted' and all such articles or equipment *which may hereafter be so marked with the approval or at the direction of* the President." (Emphasis supplied.)

Congress itself in the Act of May 13, 1950, passed only a few months prior to the statute here involved, made it a crime to communicate knowingly certain types of classified information (see 50 U.S.C. § 46a) and defined the term "classified information" as "information which, at the time of a violation under this chapter, is, for reasons of national security, *specifically designated by a United States Government agency* for limited or restricted dissemination or distribution." (Emphasis supplied.) 50 U.S.C. § 46.[3]

It could hardly be supposed that in enacting Section 783(b) Congress was not aware of this background and of the necessity for, and the existing practice of, delegation to others by the President and department heads of the authority to classify security and other defense information. It seems highly unlikely that Congress would have intended to provide a penalty for disclosure only of such information as had personally been classified by the President or the head of a department—necessarily a fairly rare occurrence. And the legislative history of Section 783(b) bears this out.

The language of Section 783(b) in the respect now pertinent, i. e., "of a kind which shall have been classified by the President (or by the head of any such department, agency, or corporation with the approval of the President) as affecting the security of the United States," was contained in identical form in Section 4(b) of the original congres-

---

2. Section 783(b), of course, does not purport to be an enabling act; the power of the Executive branch to protect secret documents affecting the national defense and security has been exercised from the beginning, and is in no way limited or extended by Section 783(b).

3. 50 U.S.C. §§ 46, 46a, and 46b were superseded by Section 24(a) of the Act of October 31, 1951, 18 U.S.C. § 798, which continued in Section 798(b) the same definition of classified information as is found in 50 U.S.C. § 46.

sional bill, S. 1194, introduced by Senator Mundt on March 8, 1949; in Section 4(b) of the second 1949 bill, S. 2311, introduced by Senator Mundt on July 22, 1949;[4] in Section 4(b) of S. 4037 introduced by Senator McCarran on August 10, 1950; and in Section 4(a) of H.R. 9490 introduced by Representative Wood in the House on August 21, 1950. This latter bill became the Internal Security Act of 1950 over the President's veto, and the pertinent section was incorporated in 50 U.S.C. § 783(b), which is now before us.

At the Senate Hearings on S. 1194, Senator Mundt pointed out that Section 4(b) of the bill grew "directly out of the experience we had in the House Committee on Un-American Activities last fall in investigation of the so-called pumpkin papers case, the espionage activities in the Chambers-Hiss case, the Bentley case, and others."[5] When S. 4037 was reported favorably on August 17, 1950, the Senate Report (S. Rep. No. 2369, 81st Cong., 2d Sess.) stated:

> "Section 4(b) makes it unlawful, except with special authorization, for any officer or employee of the United States or of any Federal agency to communicate with any representative of a foreign government or to any officer or member of a Communist organization, *information of a kind* which he knows or has reason to know has been *classified by or with the approval of the President* as affecting the security of the United States." (Emphasis supplied.)

The language emphasized indicates strongly that personal classification by the President was not required.

The debate in the Senate relative to Section 4(b) of S. 4037 centered about its possible application to employees of corporations only partly owned by the United States, and to representatives of friendly governments. Senator Kefauver considered the bill to be too broad in these respects.[6] Senators McCarran, Mundt and Ferguson replied to his criticisms. Portions of the debate are lowing:

> "MR. FERGUSON. * * *
>
> "First, we must know what we are trying to prevent. The purpose of this part of the bill is to prevent Government employees and those working for Government agencies and those who are serving in capacities in which they are likely to receive very vital information which has been classified by the President as being security information, from knowingly and willfully giving such information to foreign agents or to persons who belong to Communist organizations. 96 Cong.Rec. 14615.
>
> * * * * * *
>
> "The only persons who are entitled to receive such secret information are those whom the President of the United States or the heads of the departments allow to have such information. That is as it should be. Ibid.
>
> * * * * * *
>
> "MR. KEFAUVER. The Senator from Michigan knows that in all the

4. On March 21, 1950, S. 2311 was reported favorably by the Senate Committee on the Judiciary, with amendments designed to make the prohibitions of the bill "operative whether or not the classified information was obtained within or without the scope of the official duties or employment," and to add the requirement of scienter. The words "obtained in the course of his official duties or employment," were omitted and the words "knowing or having reason to know that such information has been so classified"

were added. See S.Rep. No. 1358, 81st Cong., 2d Sess., March 21, 1950.

5. It is a matter of common knowledge that many if not most of the documents involved in these cases were not documents personally classified or described by the President or a department head as secret or not to be disclosed. The quoted language is found at page 31 of the Hearings, cited infra at footnote 7.

6. See, for example, 96 Cong.Rec. 14240 et seq. (September 6, 1950).

departments, practically all documents are marked 'confidential' or 'restricted.' Under such circumstances, it would be impossible for anyone to have a full appreciation of what might be marked 'restricted.'

"This measure does not mean that anyone who might be so charged would have to have seen what was so marked. On the contrary, if such a person should pass on such information third hand, and if subsequently it should turn out to have been marked 'restricted,' that person would be guilty, because the amendment does not provide that the person passing on the information must have seen it.

"MR. FERGUSON. Mr. President, that is not a fact. The amendment provides that such a person must know that the material is restricted or must have reason to believe that it is restricted. How would that situation develop? It would develop in this way: If certain information is classified by the President or by the head of any Department or agency, with the approval of the President, then if any person knows that a certain paper or certain information has been *classified by the President or, on his authority, by someone else* as affecting the security of the United States, such person should not give the information to any foreign agent or any foreign government; it should be a crime for anyone to do so. * * *" (Emphasis supplied.) Ibid.

"MR. KEFAUVER. This subsection says it shall be unlawful to communicate in any way any information that has been *classified by the President or any division of the Government with the approval of the President.* That is paraphrasing it. * * *" (Emphasis supplied.) 96 Cong.Rec. 15198.

"MR. KEFAUVER. * * * I was at the Department of Justice late this afternoon. They told me, for instance, that they mark things confidential that a third or fourth assistant can read, which the President in the White House also marks confidential. We have some material marked confidential by the President which a third or fourth assistant from the top also marks confidential.

"MR. MUNDT. I am not sure of the pertinence of the Senator's question. I do not think it has anything to do with the colloquy now in progress. *So far as marking matters confidential, under this legislation it must be done by the President or someone authorized by him to do it.* I do not not want to get into all of these details. * * *" (Emphasis supplied.) 96 Cong.Rec. 15253.

Pertinent also are certain of the colloquies which occurred at the Senate hearings on S. 1194, the original bill on this subject introduced by Senator Mundt on March 8, 1949. As indicated, that bill was, and the intervening bills were, in all respects now relevant, identical with the final legislation. These colloquies are set out in the margin.[7]

These passages in the debates and hearings indicate, in our view, that the speakers understood that the President

7. "*Senator Ferguson.* What kind of papers do you have in mind that it would be a crime to deliver to allies?

"*Senator Mundt.* That is spelled out in definition. It is any paper which has been—

"*Senator O'Conor.* Classified.

"*Senator Mundt.* Yes; classified as affecting the security of the United States, all classified information.

"As the Senator understands, one time a thing is classified and at another time it is not.

"*Senator Ferguson.* I understand that, but the word 'classified' is not always under a directive of the President.

"*Senator Mundt.* By the President or by somebody acting for him.

"*Senator O'Conor.* The head of any department, agency, or corporation.

would take ultimate responsibility for the protection and classification of security documents and information, but that the actual marking of documents and the safeguarding of information would be delegated to others. There can be little doubt, in view of the legislative history taken in the light of the existing background, that Congress intended to enact a broad and effective statute, prohibiting the transfer of all documents officially classified as affecting the national security, whether or not the President or the head of a department had personally marked them as such. The question is whether the statutory language can fairly be construed to accomplish that result. We think it can.

In the first place, the statute does not read "classified by the President." It says "of a kind" classified by the President (or a department head). Those words must mean that the President (or the head of an approved department) is to establish the kinds or categories of documents and information which are to be classified by appropriate authority. This requirement has been fulfilled in the instant case, through the issuance by the President of Executive Orders, stated to be "in the best interests of the national security," and the promulgation by the Secretary of State of the regulations contained in the Foreign Service Manual. Executive Order 10501, as amended by Executive Order 10901, describes the "categories" of information which shall be classified as "Top Secret," "Secret," and "Confidential." The "Secret" category, for example, is authorized, "by appropriate authority, only for defense information or material the unauthorized disclosure of which could result in serious damage to the Nation, such as by jeopardizing the international relations of the United States, endangering the effectiveness of a program or policy of vital importance to the national defense, or compromising important military or defense plans, scientific or technological developments important to national defense, or information revealing important intelligence operations." Any information of this character is "of a kind" described by the President by Executive Order as being

"*Senator Ferguson.* Then this goes so far as to allow an administrative officer to classify anything, and the transfer of that would be criminal under your act.

"*Senator Mundt.* It permits him to transfer anything provided he has the approval of the President so to do, but it keeps the responsibility on the President. It says with the approval of the President.

\*　　\*　　\*　　\*　　\*

"*Senator Ferguson.* Has this anything to do with the national defense?

"*Senator Mundt.* This is very definitely a part of the national defense.

"*Senator Ferguson.* I mean the papers we are talking about. If it is marked 'Secret' because it is for the national defense, that is one thing, but suppose it is just marked 'Secret' and it has nothing to do with the national defense.

"*Senator Mundt.* That is covered in the definition as affecting the security of the United States. It is spelled out.

"*Senator O'Conor.* In line 12 of the bill the requirement is that the classification would be of those papers which affect the security of the United States.

"*Senator Ferguson.* That was what I wanted to get at.

"*Senator Mundt.* That is right. That is definite.

"*Senator Ferguson.* What about the person knowing, or believing or having reason to believe that it would affect the security?

"*Senator Mundt.* From the standpoint of the person against whom the statute runs he can determine that by whether it is marked 'Classified' or not. The man who does the classifying acts in his responsible capacity as the representative of the President.

"*Senator Ferguson.* All right. What you do, then, is to use the word 'classified' to be the determining feature. Suppose it is not marked?

"*Senator Mundt.* If it is classified it is marked or it is supposed to be marked.

"*Senator Ferguson.* Suppose he gets the knowledge from a classified paper and then gives it orally?

"*Senator Mundt.* If he knows or has reason to believe that it is classified, he is guilty." Hearings before a Sub-Committee of the Committee on the Judiciary, United States Senate, 81st Cong., 1st Sess., on S. 1194 and S. 1196 (1949), at 32–33.

suitable for classification as "Secret." Similarly, the Executive Order authorizes use of the classification "Confidential," "by appropriate authority, only for defense information or material the unauthorized disclosure of which could be prejudicial to the defense interests of the nation."[8]

The Executive Order goes on to select certain departments as "having primary responsibility for matters pertaining to national defense," one of which is the Department of State,[9] and provides as follows with respect to them:

"* * * the authority for original classification of information or material under this order may be exercised by the head of the department, agency, or Governmental unit concerned or by such responsible officers or employees as he, or his representative, may designate for that purpose. The delegation of such authority to classify shall be limited as severely as is consistent with the orderly and expeditious transaction of Government business."

8. The definitions of material to be classified as Secret and Confidential as set out in the regulations contained in the Foreign Service Manual are patterned on, and appear to be identical with, the definitions of those terms in the Executive Order. See §§ 911.32 and 911.33 thereof.

9. Under Section 783(b), one of the President's functions is recognized to be this process of selection. This, it seems to us, is the meaning of the words "with the approval of the President" as used in the phrase "classified by the President (or by the head of any such department, agency, or corporation with the approval of the President)." The "approval of the President" is to be given by authorizing the heads of selected agencies to institute a plan of classifying their protected documents. Appellant appears in substance to agree. His brief says:

"The 'approval of the President' refers to heads of a department, agency, or corporation, and is intended to limit the authority to classify under the statute to only *certain heads* of a department, agency, or corporation actually those having a direct responsibility for national defense or security."

Thus express authority for, and "approval of the President" of, the delegation by the Secretary of State to selected responsible officers and employees of his power to assign an original classification is given in the Executive Order. It is implicit, of course, that the original classification will be subject to review by superior officers and the Secretary.

Since the Secretary's power to delegate his authority to classify originally is established, the Ambassador's authority to classify and to certify the classification of the three Despatches in question is not debatable. He was clearly authorized as the "originator" of Despatch 344 to give the original and appropriate classification to it, and as principal officer of the Embassy, his power to certify (or to change if deemed appropriate) the original classification given by others to Despatches 518 and 444 is also plain. See the Regulations contained in the Foreign Service Manual, Part II, §§ 912.1, 913.1, and 913.2.[10] And it is equally clear that his classifications were made with the approval and under the

The designation of the agencies authorized to classify occurred when the President issued Executive Order 10501, as amended by Executive Order 10901.

10. These are as follows:

"912 *Principles of Classification and Control*

"912.1 *Assigning Classification or Control Designation*

"The originator of a document shall be responsible for the original assignment of its classification or control designation. * * *

"913 *Authority to Certify Classifications or Control Designations*
"913.1 *General*

"The final signature or approval of a document bearing a classification or administrative control designation constitutes a certification by the signing or approving officer that the classification or control designation assigned is appropriate. The officer who signs or approves such a document is called the 'certifying officer' with respect to the classification or control designation of the document. Thus, authorization to sign a document automatically confers authority to certify its classification or control des-

authority of the President and the Secretary of State.

We conclude that Ambassador Beam had authority to classify Despatches 344, 518, and 444 by virtue of the provisions of the Executive Order and the Foreign Service Manual; and that the Despatches as classified and certified by him are within the scope of Section 783(b).

■ Appellant also urges that since criminal statutes must be strictly construed, no meaning can be given to Section 783(b) beyond the narrowest interpretation of its words. He quotes from Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926), where the Supreme Court said:

"That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law. International Harvester Co. v. Kentucky, 234 U.S. 216, 221, [34 S.Ct. 853, 58 L.Ed. 1284]; . Collins v. Kentucky, 234 U.S. 634, 638 [34 S.Ct. 924, 58 L.Ed. 1510]."

■ The general principle just stated is of course well settled. But it is not to be applied in derogation of common sense, especially where the statute deals with a limited class of persons, so situated as to have special knowledge concerning the acts prohibited, and where punishment is to be imposed only on those who have scienter. See Gorin v. United States, 312 U.S. 19 at 27–28, 61 S.Ct. 429, 85 L.Ed. 488 (1941). Here the scienter requirement is explicit: Section 783(b) says that the accused must be in the posture of "knowing or having reason to know that such information has been so classified." And here the class to which the statute applies is a relatively small group—employees of the Federal Government. This group is not only a limited one: it is a well-informed one. Federal employees are subject to the orders of their superiors, and are informed by statutes, regulations, other published directives, and oral instructions, as to what they shall or shall not do in connection with their Government employment. Employees of the State Department were told, by Section 783(b) and by the regulations set out in the Foreign Service Manual, which incorporates the directives of Executive Order 10501, as amended, that they are not to communicate to representatives of a foreign government information known by them to have been classified as "Secret" or "Confidential" by officials authorized to classify them. As Mr. Justice Holmes said in a highly pertinent case, involving prohibitions against Government officials receiving or soliciting funds for political purposes:

"It is argued at some length that the statute, if extended beyond the

ignation unless a prohibition is specifically included in the authorization to sign.

"913.2 *Designation of Certifying Officers*

"Any officer at a post authorized to sign correspondence in accordance with 1 FSM II 121 is authorized to certify the classification or administrative control designation of any document which he signs, except that the Top Secret classification shall be certified only by the principal officer or his designee. The authoity to certify classifications or control designations should not be confused with the responsibility for initial assignment of a classification or control designation. Any employee who originates a classified or administratively controlled document has the responsibility for assigning the appropriate classification or administrative control designation at the time the document is prepared. The classification or control designation so assigned may be changed or eliminated by the certifying officer or by intermediate reviewing officers." Foreign Service Manual, Part II, §§ 912.1, 913:1, 913.2.

political purposes under the control of Congress, is too vague to be valid. The objection to uncertainty concerning the persons embraced need not trouble us now. * * * The other objection is to the meaning of 'political purposes.' This would be open even if we accepted the limitations that would make the law satisfactory to the respondent's counsel. But we imagine that no one not in search of trouble would feel any [trouble]. Whenever the law draws a line there will be cases very near each other on opposite sides. The precise course of the line may be uncertain, but no one can come near it without knowing that he does so, if he thinks, and if he does so it is familiar to the criminal law to make him take the risk." United States v. Wurzbach, 280 U.S. 396 at 399, 50 S.Ct. 167, 74 L.Ed. 508 (1930).[11] We think a like view must be taken here.

## II.

Appellant further urges that even if his construction of the statute—that the classification of documents must be made personally by the President or the Secretary of State—is rejected, then the Government was required to prove at the trial that the documents involved were properly classified "as affecting the security of the United States." He argues that "This would present an insurmountable hurdle since, as is obvious, the standards set forth in E.O. 10501 relate to the protection of information involving the 'national defense' and not to 'the security of the United States,' the criterion set forth in 783(b)."

But the Executive Order itself negates this. Its preamble recites that the President deems his order "necessary in the best interests of the national security." It is quite true that the classification categories set up in the Order relate to what is referred to as "defense information," but the definitions of material appropriate for classification can as well be described as relating to the national security. (See Part I of this opinion.) Appellant has not undertaken to show that "defense information," as described in the Executive Order, is not of necessity "information * * * affecting the security of the United States," within the meaning of Section 783(b). Common sense tells us that it is: defense is one aspect of security and indeed in their broad senses the two terms have a very similar connotation. The legislative history, as we have seen, shows that Congress must have equated the two terms.[12] Furthermore, Ambassador Beam, who was primarily responsible for the classifications involved here, testified that the classifications "Top Secret," "Secret" and "Confidential" were security classifications applying to information which should be protected in the interest of national defense. And the definition of "Defense Information" contained in Section 911.2 of the regulations in the Foreign Service Manual is phrased in terms which include protection of the national security, both internal and external, in every aspect; it is not limited to protection against physical attack.[13]

---

11. See also *Hygrade Provision Co. v. Sherman*, 266 U.S. 497 at 501–502, 45 S.Ct. 141, 69 L.Ed. 402 (1925):

"By engaging in the business of selling kosher products they [appellant meat dealers] in effect assert an honest purpose to distinguish to the best of their judgment between what is and what is not kosher. The statutes require no more." Similarly, in *United States v. Hood*, 343 U.S. 148 at 151, 72 S.Ct. 568, 96 L.Ed. 846 (1952), it is said:

"This Act penalized corruption. * * * " * * * The picture of the unsuspecting influence merchant, steering a careful course between violation of the statute on the one hand and obtaining money by false pretenses on the other by confining himself to the sale of non-existent but plausible offices, entrapped by the dubieties of this statute, is not one to commend itself to reason."

12. See, for example, the colloquy in fn. 7, *supra*, between Senators Ferguson and Mundt.

13. "911.2 *Defense Information*

"The Department was informed by the Attorney General of the United States on April 17, 1954, that defense classifi-

We think, therefore, that documents classified as "Secret" or "Confidential" pursuant to the Executive Order and the Foreign Service Manual are "classified * * * as affecting the security of the United States," within the meaning of Section 783(b). The remaining inquiry is whether the prosecution was required to show that they were properly so classified. In our view, the answer to this question must be in the negative.

There is no suggestion in the language of Section 783(b), by specific requirement or otherwise, that the information must properly have been classified as affecting the security of the United States. The essence of the offense described by Section 783(b) is the communication—by a United States employee to agents of a foreign government—of information of a kind which has been classified by designated officials as affecting the security of the United States, knowing or having reason to know that it has been so classified. The important elements for present purposes are the security classification of the material by an official authorized to do so and the transmission of the classified material by the employee with the knowledge that the material has been so classified. Indeed, we think that the inclusion of the requirement for scienter on the part of the employee is a clear indication of the congressional intent [14] to make the su-

cations may be interpreted by the Department, in proper instances, to include the safeguarding of information and material developed in the course of conduct of foreign relations of the United States whenever it appears that the effect of the unauthorized disclosure of such information or material upon international relations or upon policies being pursued through diplomatic channels could result in serious damage to the Nation. The Attorney General further noted that it is a fact that there exists an interrelation between the foreign relations of the United States and the national defense of the United States, which fact is recognized in section 1 of Executive Order 10501. Accordingly, defense information shall be interpreted as including information or material which, if disclosed to unauthorized individuals, may result in a break in diplomatic relations affecting the defense of the United States; may cause an armed attack to be launched against the United States or its allies; may reduce the ability of the United States to defend itself against attack; may increase the enemy's ability to wage war against the United States; may compromise military or defense plans, intelligence operations, or technological developments vital to national defense; may jeopardize the international relations of the United States; or may endanger the effectiveness of a program or policy of vital importance to the national defense or otherwise be prejudicial to defense interests. Illustrative examples of such information which may require classification include:

"a. Information and material relating to cryptographic devices and systems;

"b. Information pertaining to vital defense or diplomatic programs or operations;

"c. Intelligence or information relating to intelligence operations which will assist the United States to be better prepared to defend itself against attack or to conduct foreign relations;

"d. Information pertaining to national stockpiles, requirements for strategic materials, critical products, technological development, or testing activities vital to national defense;

"e. Investigative reports which contain information relating to subversive activities affecting the internal security of the United States;

"f. Political and economic reports containing information, the unauthorized disclosure of which may jeopardize the international relations of the United States or may otherwise affect the national defense; or

"g. Information received in confidence from officials of a foreign government whenever it appears that the breach of such confidence might have serious consequences affecting the national defense."

14. The following passage from the Senate debate is of interest here:

"*Mr. Ferguson.* It says 'information which has been classified.'

"*Mr. Kefauver.* That is correct; but it does not mean that the individual must actually seize the document to come within the terms of the bill.

"*Mr. Ferguson.* The person would have to know the information contained in the document is classified.

perior's classification binding on the employee, once he knows of it.[15]  Cf. Gorin v. United States, 312 U.S. 19, 27–28, 61 S.Ct. 429, 85 L.Ed. 488 (1941).  The excerpts from the Senate Hearings set out above in footnote 7, supra, confirm this.

Gorin v. United States, supra, involved a prosecution under Sections 1(b) and 2 of the  Espionage Act of 1917, for obtaining any information connected with or relating to the national defense and delivering it to an agent of a foreign country with an intent, or reason to believe, that it is to be used to the injury of the United States or the advantage of a foreign nation.  The Supreme Court held that the statute embraced everything connected with or related to national defense in its well understood connotation (312 U.S. at 28, 61 S.Ct. at 434), and that, once properly instructed as to the meaning of national defense as used in the statute, it was for the jury to determine whether the documents involved were in fact connected with the national defense.[16]  Here, similarly, the function of the court was to instruct as to the meaning of "classified" information, the disclosure of which would be violative of Section 783(b), and the function of the jury was to decide whether the information revealed was classified information in that sense.

The Gorin case does not support the proposition that in a prosecution under Section 783(b) the jury must be permitted to determine not only the question whether the document was classified but also whether it affected the security of the United States.  The Espionage Act of 1917, involved in Gorin, covered the entire population: it forbade any person to obtain and deliver documents connected with the national defense, irrespective of whether they had been so classified or marked, and the factual determination whether they were so connected had to be resolved in each case.  However, as we have noted, Section 783 (b) was aimed at a small group—employees of the Federal Government.  Under the Foreign Service Regulations, see footnote 10, supra, only the originator of a document is authorized to assign the original classification, and only certain other officers are authorized to certify the classification and to review or change it.  As already shown, this procedure is in accord with the Executive Order and has the approval of the President.  Once the classification has been given and certified, every employee must respect it until an official authorized to change the classification has done so.  In the meantime, if a Foreign Service employee sees a document marked "Secret" or "Confidential" and has legitimate reasons for thinking that the security interests of the Government would be better served by treating the document as unclassified, he may apply to his superiors, give those reasons, and have the point decided.  But certainly an employee of the State Department could not bring an action in the courts to remove the label "Secret" attached by his superiors to a

"*Mr. Kefauver.*  Or have reason to believe that it is confidential.
"*Mr. Ferguson.*  Or to be told that it is."  96 Cong.Rec. 14242.

15. There can of course be no contention, and there is none, that appellant was not aware that the Despatches involved here were classified as affecting the security of the United States.  Each page of each Despatch was marked at top and bottom with its classification.  And appellant as a foreign service officer was charged with knowledge of the regulations applicable to such officers, relating to classified material.

16. The Supreme Court said:
"The function of the court is to instruct as to the kind of information which is violative of the statute, and of the jury to decide whether the information secured is of the defined kind.  It is not the function of the court, where reasonable men may differ, to determine whether the acts do or do not come within the ambit of the statute.  The question of the connection of the information with national defense is a question of fact to be determined by the jury as negligence upon undisputed facts is determined."  312 U.S. at 32, 61 S.Ct. at 436.

particular document, simply because he was being blackmailed and wished to be able to offer the document to his blackmailers without criminal consequences. Merely to describe such a litigation is enough to show its absurdity. Yet appellant is urging that after such an employee has obtained and delivered a classified document to an agent of a foreign power, knowing the document to be classified, he can present proof that his superior officer had no justification for classifying the document, and can obtain an instruction from the court to the jury that one of their duties is to determine whether the document, admittedly classified, was of such a nature that the superior was justified in classifying it. The trial of the employee would be converted into a trial of the superior. The Government might well be compelled either to withdraw the prosecution or to reveal policies and information going far beyond the scope of the classified documents transferred by the employee. The embarrassments and hazards of such a proceeding could soon render Section 783 (b) an entirely useless statute.

██ We conclude that it is the intent of the statute to make the superior's classification binding on the employee. In this case, if the Government's evidence be believed, appellant knew perfectly well what he was about: the Polish agents were demanding classified (i. e., valuable and secret) information, and he tried to satisfy their demands. He cannot now claim that the Government is required to prove that the documents he gave were in fact properly classified.[17] The factual determination required for purposes of Section 783(b) is whether the information has been classified and whether the employee knew or had reason to know that it was classified. Neither the employee nor the jury is permitted to ignore the classification given under Presidential authority.

### III

We turn to appellant's contention that it was error to admit in evidence the four inculpatory statements given by him under circumstances now to be related.

As already indicated, appellant was ordered by the State Department to report to the United States Embassy in Bonn, Germany, on June 5, 1961, for a conference. Upon his arrival in Bonn, appellant, having given his consent, was driven in a car to Frankfurt and was taken at about 1 p. m. to a room in the annex to the American Consulate. The security officer in charge at the United States Embassy in Germany, Kenneth W. Knauf, was awaiting his arrival. Appellant was there interrogated by Knauf, and during the interrogation appellant told of giving classified information to two Polish nationals believed by him to be U.B. agents. A statement, including the confession, was dictated by appellant (except for the opening and concluding paragraphs) to a stenographer from about 7:30 p. m. until 8:15 p. m. It was typed by her, and was returned to appellant. He read it, made a few minor corrections, and signed it at about 10:30 p. m. The confession, as signed, con-

17. His counsel seems to have agreed to this at the trial, as indicated by the following colloquy in the trial court:

"THE COURT: The question that we have to determine is did this defendant take a document that was on the face of it listed as Top Secret, Secret or Confidential, the document itself. Then we are going to start in to evaluate what the State Department should have considered—

"MR. KLEIN [counsel for defendant, now appellant] (interposing):—which we are not going to do. What I am going to relate to another exhibit which shows when a document should have been clas-

sified as Secret and show there was over-classification. I think I have a right to do that.

"Of course he has the authority to classify anything he wants Secret or Top Secret.

"THE COURT: But my only point is, that once he does classify it, it is not for an employee to determine that it is mis-classified.

"MR. KLEIN: Yes.
"THE COURT: Do you get my point?
"MR. KLEIN: Yes, of course.
"THE COURT: Now don't you agree?
"MR. KLEIN: Yes, I agree."

cluded with a declaration, admittedly dictated by Knauf, that: "The foregoing statement is made of my own free will. * * * I certify that no coercion, force, pressures, duress, press [promises?] or threats were made against me. During the conversation on this date, Mr. Knauf has explained to me my rights under the Constitution. * * *" After reading the quoted conclusion of the statement, and before signing it, appellant remarked "No pressures?" and Knauf replied "Only moral pressures." A tape recording of the interview was made while it progressed, apparently without appellant's knowledge. The tape was introduced in evidence as part of the defense, and has been made available to us.

Toward the end of the interrogation, Knauf had telephoned his superiors in Washington and was asked by them to bring appellant there. Appellant was informed of this and agreed to accompany Knauf to Washington. Arrangements were made for Knauf and appellant to fly from Dusseldorf to New York at 8:00 the next morning. Appellant and Knauf were driven to Knauf's home in Bonn, where they slept for about two hours. They then went to the airport, boarded a plane and arrived in New York at about 1:45 p. m. on June 6th. They were met by another Department of State Security Officer, who expedited their clearance through customs and immigration. During this period Knauf took appellant's passport. Appellant and Knauf then flew to Washington, going directly from the Washington Airport to the State Department. A suite consisting of two bedrooms, and a bathroom between, all of which opened onto a private corridor, had been arranged for them by the State Department at a nearby motel. A State Department officer accompanied appellant to the motel, despite appellant's protests that he could find his way by himself. Appellant chose to occupy the inner bedroom, which had a television set and an attached sun porch, and Knauf occupied the bedroom nearest the door leading into the suite. Neither of the rooms had

a telephone. Both bedrooms had air-conditioning units and both, like the bathroom, had windows opening onto a fire escape with a drop ladder.

On June 7 appellant and Knauf went to the office of the Assistant Chief of the Bureau of Security of the State Department, where appellant retold his story. After concluding this account, appellant was escorted to the cafeteria for lunch. After lunch he was asked if he objected to being interviewed by the F.B.I. He said he had no objections. He was interrogated for the rest of the day in an office in the State Department building by two agents of the F.B.I. A written statement was obtained from appellant. On each of the next two days (June 8 and 9), appellant was further interrogated by the F.B.I. agents, and on each day he signed another written statement. It is undisputed that on each day before he was questioned the agents told him that he was free to leave and warned him of his constitutional right to remain silent, and of his right to obtain legal counsel. Before appellant signed the statements the agents each time told him that he did not have to give a written statement, that if he did it might be used against him, and that he had a right to consult an attorney before giving such a statement.

About 4 p. m. on Saturday, June 10, upon his return to the motel from a long walk with a security officer, appellant was handed a suspension notice by a personnel officer of the State Department. From the morning of June 5th when appellant reported to the U. S. Embassy in Bonn until the time he received this notice on June 10 appellant was, with the exception of the times he was alone in his bedroom at Knauf's home in Bonn and in his bedroom at the motel, constantly in the company of security officers of the State Department or agents of the F.B.I. During this time appellant did not ask to communicate with a lawyer, he did not refuse to accept an escort, although he protested mildly on several occasions, and he did not refuse

to submit to interrogation, although warned of his rights.

After his suspension, appellant was not accompanied and moved about as he wished, alone. On Monday, June 12, he moved to a single room in the motel, where he stayed until the morning of June 13. On that morning, as he left the motel to walk to the State Department, where he had been asked to report, he was arrested by the F.B.I. on a warrant, and was taken promptly before the United States Commissioner.

■ Appellant made a timely motion to suppress his admissions. He argued that the confession of June 5th to Knauf was coerced and should have been excluded, and that the subsequent statements made to the F.B.I. were a product of the original involuntary confession, and should likewise be ruled inadmissible. Alternatively, he based his motion to suppress on the ground that he was under arrest from the time of his arrival at Frankfurt—or some time subsequent thereto but prior to the time at which statements were given to the F.B.I.—and that, consequently, his statements (or at least the three made in the United States) were inadmissible under the rule of Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). Evidence was heard on this motion, including testimony by appellant given outside the hearing of the jury and restricted to the issues raised by the motion. His testimony has been incorporated in the summary of facts given above. The trial judge, stating that he had given careful consideration to all the evidence, denied the motion. No findings of fact or rulings of law were stated in connection with the ruling, nor was any request for specific findings or rulings made by counsel. Accordingly, we must uphold the ruling of the trial court if there is any reasonable view of the evidence that will support it.

■ We cannot say that the decision of the trial judge—to permit the confessions to go to the jury with an instruction on the issue of coercion—was not proper. There was no evidence of physical violence. Indeed, appellant claims only that there was psychological pressure on him in the Knauf interview. Appellant was shown to be a man of intelligence and experience, including experience in interrogation while serving in U. S. Military Intelligence and in the Office of Military Government in Germany. He testified that Knauf introduced himself as a security officer, that he raised no objection to the interrogation, that Knauf as Chief Security Officer in Bonn was within his rights in questioning him about the mistakes he had made in his job, and that during the questioning he knew he had the right to remain silent, but "the way in which Mr. Knauf was presenting his points, one by one, naturally put tremendous pressure on me to keep answering his questions." [18] He also testified that "I did not tell Mr. Knauf that I would not sign the statement, and Mr. Knauf did not force me to sign the statement. By this time we had reached a point where Mr. Knauf was very well aware that I no more wished to sign that statement than he wished me to walk away without signing it, but I was in no position to bargain with Mr. Knauf. Mr. Knauf held all the whips and the whip hand."

The trial judge heard testimony from both Knauf and the appellant giving their recollections of the interview. Knauf's testimony alone was heard by the jury. The trial judge first, and later the jury, heard the tape recording of the interrogation. It has been submitted to us as an exhibit—introduced by defendant-appellant. The recording is of unsatisfactory quality and appears to be not entirely complete, but we have found little in it to support the claim of coer-

18. His testimony continued as follows: "If you are placed in the position where you know that you can keep your counsel to yourself and not open your mouth, but at the same time there are certain things being held out either in front of you or over your head where you think that if you continue to cooperate, then I think very likely you will probably keep answering the questions."

cion. The impression given is that the interview was conducted on a fairly friendly basis throughout. From all the materials available to us, we are unable to conclude that the trial judge and the jury erred when they found that the admissions made were voluntarily given.

■ Appellant argues that Knauf's statement, that "only moral pressures" were used during the interrogation, amounts to concession of improper coercive tactics rendering the confession inadmissible. It is clear, however, that this phrase was used in reference to the appeals to integrity, conscience, patriotism, and the like, that he employed in the course of the interrogation. Such appeals, in and of themselves, do not amount to improper coercion.

■ We also are unable to agree with appellant's second line of reasoning for exclusion of these statements—that the conduct of the State Department officials and F.B.I. agents amounted to a violation of the Mallory rule. The issue here, as in any other invocation of the Mallory rule, is whether the inculpatory statements were obtained during a period of unlawful detention in violation of Rule 5(a) of the Federal Rules of Criminal Procedure, which provides that "any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available commissioner * *." A period of unlawful detention cannot exist, of course, unless there has been an arrest or action amounting to arrest. In the unusual circumstances of this case, we must decide whether appellant was, at the time he made the inculpatory statements, being involuntarily detained, for, if his presence and participation were voluntary, it is well established that the Mallory rule is inapplicable. See Vita v. United States, 294 F.2d 524 (2d

Cir., 1961), cert. denied, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788 (1962); United States v. Pravato, 282 F.2d 587 (2d Cir., 1960); Trilling v. United States, 104 U.S.App.D.C. 159, 172, 260 F.2d 677, 690 (1958) (separate opinion, dictum); Metoyer v. United States, 102 U.S.App.D.C. 62, 66, 250 F.2d 30, 34 (1957) (dissent, dictum); cf. Dunn v. United States, 273 F.2d 470 (5th Cir., 1960); Holzhey v. United States, 223 F.2d 823 (5th Cir., 1955).

In analyzing this contention, it is useful to distinguish between the statement of June 5th given to Knauf and the subsequent statements made to the F.B.I.

■ The attack on the statement of June 5th represents the first time, to our knowledge, that the McNabb [19]-Mallory line of decisions has been invoked to obtain suppression of a confession made in a foreign country. We do not now have to decide under what circumstances a confession made abroad would fall within the prohibition enunciated by these cases because, in the present case, there was ample evidence to support the conclusion that appellant had not been involuntarily detained.

Knauf testified that as a security officer he had no power to arrest. The testimony of both appellant and Knauf in the lower court supports the inference that appellant was aware that Knauf could not arrest him.[20] The tape shows that after some general conversation about matters not here involved, Knauf said that it was time to interject a statement so that appellant would understand the situation. He said that they would probably have a long conversation that afternoon, that appellant would be within his "rights" in not answering some of the questions that would be asked, that appellant might want not to answer some questions because they might tend

19. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); Compare Bram v. United States, 168 U.S. 532, 561–565, 18 S.Ct. 183, 42 L.Ed. 568 (1897).

20. Appellant testified that he was told, probably after he had signed the statement, that Knauf could not arrest him, but that Knauf could ask the Germans to arrest him. Appellant admittedly had assisted in procuring a German visa for Miss Discher by illegal means.

to incriminate him or for other reasons, that Knauf preferred to have appellant decline to answer rather than to lie to him, that he could not "push" appellant to answer, but that "integrity was an integral part" of this and that "as a matter of integrity" appellant was obliged to answer, and finally that, if he believed that appellant was lying, he would get someone in to put appellant under oath and would have him sign a statement. Appellant said that he understood. He did not undertake to leave at that time or later. As noted above, he testified that Knauf as a security officer was within his rights in questioning him, that he knew he had the right to remain silent, and that he raised no objection to the interrogation. Appellant may have been influenced to stay and participate in the inquiry by any one or a combination of a number of factors—conscience, integrity, a belief that if he left the room or building he might be summarily discharged from his position with the Foreign Service, or possibly that he might be arrested by the Germans (see footnote 20, supra). But as he in effect acknowledged, it is surely the prerogative of a Government agency investigating matters vitally related to the national security to request its employees to cooperate when confronted with reasonable inquiry into their activities. In any event, we find nothing which would amount to an arrest at that time, or to duress vitiating appellant's confession to Knauf.

We turn now to the confessions made to the F.B.I. on June 7th, 8th, and 9th. On the evidence presented, the trial judge concluded that appellant's participation was voluntary, and that there was no unlawful detention. In reaching this conclusion the judge must necessarily have decided that the mere fact that appellant was continually accompanied by one or more State Department officials, from the morning of June 5 until after the last statement was given to the F.B.I. agents on June 9, did not, without more, amount to an arrest, and that there were no other circumstances from which appellant could reasonably have concluded that he had been deprived of his freedom of movement. We think the trial judge could properly reach the conclusion he did reach. Appellant testified that he was asked whether he objected to talking to the F.B.I., and had replied that he did not. Although he was informed by the F.B.I. agents that he could consult an attorney, he did not do so, nor did he attempt to reach friends to inform them of his predicament. He made no complaint about the accommodations provided for him and made no sustained effort to depart from the company of the State Department officials, nor any serious protest about the treatment he was receiving. From about 4 p. m. on June 10 until his arrest on June 13 he was not accompanied by State Department officials and made use of his freedom to come and go as he wished. Although this was after his statements had been given, it is not without significance. The statements that he signed, taken together with the testimony of the F.B.I. agents who dealt with him, support the belief that his major desire was to be as cooperative as possible with regard to the inquiry that was being conducted. The clear inference is that he thought he might avoid or mitigate punishment, and help his dependents, by assisting in the inquiry. There may be cases in which, although no formal arrest has occurred and the suspect, after being advised of his rights, has expressed no objection to being interviewed by them, the conduct of law enforcement officials who interrogate the suspect clearly creates an unlawful detention. But this is not such a case. Here the evidence fully supports the conclusion that appellant was willing, one might indeed say eager, to reveal as much information as he could. That appellant's conduct may have been motivated by hope that he could, by virtue of his cooperation, benefit himself and others, does not affect the admissibility of his statements unless the hope was implanted by promises made to him, a state of affairs not suggested in the evidence.

We conclude, therefore, that the trial judge properly admitted all four statements made by appellant.

## IV.

We now come to the question whether the proof was sufficient to support appellant's conviction. As we have seen, he was charged with, and was found guilty of, passing, sometime during the first five months of 1961, to persons known to be agents of the Polish Government, information contained in three Despatches, Nos. 344, 518 and 444, known by him to be classified as affecting the security of the United States, in violation of 50 U. S.C. § 783(b). Combining the language of the first three counts of the indictment and the language of 50 U.S.C. § 783(b), set out supra in Part I, which lays down the requirements for finding a person guilty of violation of its terms, there are five essential elements which must have been proved by competent evidence to sustain the conviction:

(1) The defendant must have been an officer or employee of the United States or of some department or agency thereof.

(2) The defendant must have communicated in some manner information from Despatches Nos. 344, 518 and 444.

(3) The information communicated from these Despatches must have been of a kind classified "by the President, or by the head of a department with the approval of the President," within the meaning of Section 783(b), as affecting the security of the United States.

(4) The person to whom the information was communicated must have been a person that the defendant knew or had reason to believe was an agent or representative of a foreign government.

(5) The defendant must have had reason to know that the information communicated had been classified as affecting the security of the United States.[21]

■ We have seen that the appellant was interrogated by security officers of the State Department and by agents of the F.B.I. after he was under suspicion, and that he made oral admissions and confessions to them and gave them written statements, all of which were received in evidence. It has long been the rule that admissions of an accused made outside the courtroom while under suspicion are not sufficient alone to prove guilt: there must be corroborating evidence to support them. The decisions in Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954), and Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954), deal with the extent of the corroboration necessary for this purpose. They provide the guiding rule for us, namely, that extra-judicial confessions or statements made by the accused after the act and when he is under suspicion are not admissible unless they are supported by corroborative evidence; that this evidence "need not be sufficient, independent of the statements, to establish the *corpus delicti*" (Opper, 348 U.S. p. 93, 75 S.Ct. p. 164); that the independent evidence must be "substantial" and must "tend to establish the trustworthiness of the statements" made by the accused and must support "the essential facts admitted sufficiently to justify a jury inference of their truth"; and that such evidence thereby serves the "dual function" of bolstering the admissions, i. e., making them reliable, and of thus proving "the offense 'through' the statements of the accused" (Opper, 348 U.S. p. 93, 75 S.Ct. p. 164; Smith, 348 U.S. p. 156,

21. It must also appear, if the point is raised as a defense, that the defendant was not specifically authorized to disclose the information. The appellant did not and does not contend that he was authorized to disclose. He admits on brief that he knew that disclosure had not been authorized. The Government established in its case in chief that the Ambassador did not authorize disclosure of the three classified Despatches in issue. It is thus unnecessary for us to decide whether, if the Ambassador had undertaken to give such authority, the authority from him would have been sufficient under the statute to exonerate a person making disclosure in reliance upon it.

75 S.Ct. p. 199).[22] In other words, if the independent evidence is sufficient to establish the truth, trustworthiness and reliability of the accused's statements to the investigating authorities, and the statements themselves supply whatever elements of the offense are not proved by the independent evidence, the proof is sufficient to send the case to the jury. That this is the correct construction seems clear not only from the language used but also from the fact that in Opper one essential element of the offense, the payment of money to the Government employee, was proved directly only by the defendant's extra-judicial statement.[23]

We proceed to examine whether there was in this case evidence, independent of the admissions and confessions made by the defendant to investigating officers after the acts were committed, which, if credited, would prove each of the five elements of the crime in the way outlined above as to each count of the indictment.

As we have noted, Ambassador Beam's testimony was that Scarbeck was employed as Second Secretary and General Services Officer at the Embassy of the United States at Warsaw, Poland, from December 1958 until June 1961, thereby proving Element (1) of the offense as set out above, which in fact is not in dispute. The Ambassador testified further that the three Despatches in question had been given security classifications, and were so certified by him, meaning that the information in them is to be protected in the interest of national defense, and that the classification given was stamped at the top and bottom of each page of each Despatch.[24] If this testimony is credited, Element (5) of the offense as so numbered above has been met. Since the classification "Secret" or "Confidential" was stamped at the top and bottom of each page of the three Despatches in question, Scarbeck must have known that the information had been classified as affecting the security of the United States. (See footnote 15, supra.) The Ambassador's testimony that his authority to classify and certify the three Despatches came from Executive Order 10501, as amended by Executive Order 10901, and the Foreign Service Regulations, disposes of Element (3). The Executive Order mentioned, as we have seen, gives the approval of the President to classification, for security and defense purposes, of specified kinds of material by such responsible officers or employees as the Secretary of State may have designated. Under the Foreign Service Manual, Section 121.2, and Sections 912.1, 913.1 and 913.2 set out in footnote 10 above, there is no question that the Ambassador as principal officer of the Embassy had received authority from the Secretary to classify, and certify the classifications of, the three Despatches involved here. As we have noted, we cannot construe the statute as authorizing one accused of passing classified information to claim that he was entitled to substitute his own judg-

22. The Court said in Smith:
"All elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused. Cf. Parker v. State, 228 Ind. 1, 88 N.E. 2d 556 [89 N.E.2d 442]." 348 U.S. at 156, 75 S.Ct. at 199.

23. The opinion indicates (see 348 U.S. at 94 and fn. 12, 75 S.Ct. at 165 fn. 12) that the independent corroboration consisted of a long distance call made the day before the cash payment was made, the drafting of a check by the petitioner on that day, and the purchase of air transportation for a trip by the Government employee on the day of payment. As the Supreme Court stated, this evidence tends "to prove the truthfulness of petitioner's statements," but it obviously does not prove directly that on the day in question or any other day the petitioner paid in cash $1,000 to the Government employee. (The $1,000 check was not cashed until several days after the day on which the petitioner admitted making payment in cash and at that time it was cashed by the petitioner, not the employee.)

24. These markings appear on the Despatches, which were introduced in evidence.

ment as to the propriety of the classification for that of the Ambassador, or for a court to do so.

■■■■ As to Element (4), there was independent evidence—Miss Discher's testimony—that Scarbeck knew or had reason to believe that the Polish men, with whom he met frequently after the compromising incident in her apartment, were agents of the Polish Government. Her testimony will be summarized later. It is sufficient to say now that it, if believed, abundantly establishes this point.

Element (2), whether Scarbeck communicated any of the information contained in Despatches 344, 518 and 444 to these men, is directly evidenced only by Scarbeck's extra-judicial statements to investigators made after the three acts of communication had occurred and after he was under suspicion. The question thus arises whether or not the Government introduced independent evidence of a quantum and quality sufficient to corroborate his admissions within the meaning of Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954), and Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954), i. e., whether a jury would be warranted in inferring from the independent evidence that the defendant's statements are reliable and true.

Miss Discher's testimony confirmed and agreed with Scarbeck's statements with respect to how they met, his relations with her, and the events on the night of December 22–23, 1960, when men broke into her apartment, finding them in a compromising situation and photographing them. She testified further that Scarbeck told her, following this incident, that he was being blackmailed by two men from the U.B., and that "they wanted him to get for them the cipher, and then some kind of a plan of work he was receiving from Washing-

ton". This agrees with Scarbeck's extra-judicial statements. In reply to the question "Did Mr. Scarbeck ever tell you, Miss Discher, whether or not he ever give anything to these U-B men?" she said: "As far as I know and what I know from Mr. Scarbeck, if they received anything they were trifles". She also testified that he told her the U.B. agents had offered him money, and she told him not to accept any money from them; that after December 22, 1960, Scarbeck "took care" of getting a residence permit for her, which she had never had before; that Scarbeck "took care" of getting a passport for her to leave Poland, and that she was told by Scarbeck that the man who handed the passport to her must have been George, one of the two U.B. agents with whom Scarbeck had been meeting once or twice a week, or rather frequently. While her testimony does not directly show that Scarbeck passed to the U.B. information from the three classified Despatches named in the indictment,[25] a jury could well conclude from it that after December 23, 1960, he met frequently with these men, that the men offered him money, that he was being blackmailed by them, that he passed some kind of information to them, and that it may very well have been classified material, since he was able to procure through them Polish documentation of a sort very difficult to obtain. And in any event the jury could conclude that her testimony, which agreed on so many points with his statements, confirmed the reliability and truth of his statements. All the more so, since she appeared to be a reluctant and perhaps even a hostile witness for the Government.

There were other witnesses to corroborate other portions of his statements. Three Embassy employees testified that, commencing in January 1961, they saw Scarbeck reading the Reading

---

25. The appellant's statements to her, although extra-judicial, were contemporaneous with the events to which they related and were not made at a time when he was under suspicion, and thus were not the type of admission involved in Opper.

File [26] in the Embassy's File Room on various occasions, and that they had not seen him doing this before January 1961. Miss Jokel, in charge of the File Room, stated that Scarbeck did this two or three times a week for about three months starting in January of 1961, and that on three occasions during this period he asked for Despatch 344. Major Tarbell of the Embassy staff testified that in late March of 1961 he discussed a Despatch relating to the Polish Armed Forces with Scarbeck in the Embassy File Room, where Scarbeck was reading a confidential Despatch, and that Scarbeck was familiar with the Armed Forces Despatch. (Despatch 518, classified "Secret," deals with the Polish Armed Forces.)

This evidence, if credited, corroborates and tends to show the truth of Scarbeck's admissions that, in order to obtain information to pass to the two Polish U.B. agents, he resorted to reading regularly the Reading File maintained for the information of Embassy officers. It also confirms that he made a rather determined effort to obtain and did obtain Despatch 344, and that he was familiar with the contents of Despatch 518.

Three other witnesses connected with the Embassy established with Embassy records (introduced in evidence) that at 5:30 p. m. on February 6, 1961, Scarbeck left a classified envelope with Marine Guard Post No. 1 at the Embassy and checked out of the Embassy at 5:40 p. m.; that after checking in at the Embassy at 9:15 p. m. he withdrew the envelope from the Guard Post at 9:20 p. m.; and that at 11:25 p. m. he again left a classified envelope with Marine Guard Post No. 1, and checked out of the Embassy at 11:35 p. m. Miss Cwynar, a stenographer at the Embassy, testified that, after ascertaining from Scarbeck that Despatch 344 had been left by him with the Marine Guard Post, she withdrew at 9:15 a. m. a day or two later the classified envelope left on February 6 at 11:25 p. m. by Scarbeck and that she found Despatch 344 in it. This evidence confirms and tends to establish the trustworthiness of Scarbeck's admissions relating to the manner in which he withdrew Despatch 344 from the Embassy in an effort to avoid suspicion. He stated that for this purpose he put blank sheets of paper in the envelope marked "Classified" which he left with the Marine Guard on the first occasion, that he carried Despatch 344 out and brought it back secretly, and that, after withdrawing the envelope and carrying it to his office, he then placed the Despatch in the "Classified" envelope which he again left with the Guard on the second occasion that same evening.[27]

Friedrick Cordes, a German policeman stationed in Frankfurt, Germany, gave detailed testimony relating to the assistance he provided in getting Ursula Discher out of Poland, and relating to Scarbeck's visit with her in Frankfurt, which in general confirmed Scarbeck's

---

26. The Reading File was maintained for the information of officers of the Embassy. It contained a chronological compilation of outgoing airgrams and Foreign Service Despatches in one book and in another book copies of incoming and outgoing telegrams. Some of the material was unclassified, whereas other documents in the file were classified and were stamped with the classification given.

27. Appellant argues that his acquittal by the jury of the charge, under Count 4 of the indictment, of removing Despatch 344 on file at the United States Embassy in Warsaw in violation of 18 U.S.C. § 2071, necessarily means that the jury believed that he did not secretly take Despatch 344 out of the Embassy, contrary to his own statements. It may very well be, however, that the jury did not regard an absence of the Despatch from the Embassy of approximately three and one half hours (5:40 to 9:15 p.m.) as a "removal" within the meaning of the statute. Or the jury may have had other reasons for reaching the verdict of acacquittal under Count 4. In any event, an acquittal under Count 4, even if it may be regarded as inconsistent with the verdict of guilty under Count 1, is not enough alone to justify us in overturning the verdict on Count 1. Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932).

statements about this matter. Cordes also testified that Scarbeck complained in Frankfurt that he and Miss Discher were being followed, and that he requested Cordes' aid in ascertaining the identity of the followers. This also is in general accord with Scarbeck's statements.

■ In short, there was independent evidence which if credited confirms the truth of a substantial part of Scarbeck's statements—those statements relating to his relationship with Miss Discher, his relationship with, and blackmail by, two U.B. agents, the statements that they demanded security information from him and offered him money and that he was able to and did procure a residence permit and a passport for Miss Discher through them, his statements as to the method by which he procured a German visa for her and the method by which he was able to take Despatch 344 from the Embassy without incurring suspicion, and his statement that at a time after he became involved with the agents he first engaged in reading the Reading File regularly to obtain information to give to them. (It was from this reading, he said, he obtained the information from Despatches 518 and 444 which he said he communicated.) This evidence appears to us more than ample to support the reliability and truth of the confessions generally. It warrants an inference that, to gain the favors that he did obtain from the U.B. agents, he necessarily communicated something of value to the agents, and that it thus proves *through the defendant's statements* that the information communicated was from the named Despatches within the scope of Opper and Smith.

## V.

Appellant's final argument is that the trial judge erroneously denied his motion for a new trial on the grounds of newly discovered evidence—evidence that allegedly sheds new light on the nature of the interrogation in Germany. However, the "evidence" proffered appears neither newly discovered nor relevant to any of the issues in the case. The motion was properly denied.

■ For the reasons given, the judgment of conviction, and the order denying a new trial, will be affirmed. However, in view of the extent of appellant's cooperation with the authorities during the investigation, we think the District Court should seriously consider exercising its power, under Fed.R.Crim.P. 35, to reduce the sentences which have been imposed, as for example, by making them run concurrently. See Kaplan v. United States, 241 F.2d 521, 523 (5th Cir.), cert. denied, 354 U.S. 941, 77 S.Ct. 1406, 1 L.Ed.2d 1539 (1957).

Affirmed.